## HARTFORD–EMPIRE CO. v. OBEAR–NESTER GLASS CO. et al.

### No. 9286.

Circuit Court of Appeals, Eighth Circuit.

June 1, 1934.

Rehearing Denied July 30, 1934.

BOOTH, Circuit Judge, dissenting.

———◆———

A. C. Paul, of Minneapolis, Minn. (John H. Bruninga, of St. Louis, Mo., on the brief), for appellant.

William R. Wood, of Cincinnati, Ohio and Lawrence C. Kingsland, of St. Louis, Mo. (John D. Rippey, of St. Louis, Mo., and Edmund P. Wood, of Cincinnati, Ohio, on the brief), for appellees.

Before STONE and BOOTH, Circuit Judges, and WYMAN, District Judge.

STONE, Circuit Judge.

This is an action for infringement of certain claims of four patents having to do with the feeding of molten glass to molds in which hollow ware, such as bottles and jars, is blown. The patents and claims involved are as follows: Claims 1, 2, 3, and 4 of Peiler, No. 1,405,936, issued February 7, 1922; claims 2, 4, 14, 21, 24, 25, 26, 27, 31, 33, and 36 of Peiler, No. 1,662,436, issued March 13, 1928; claims 24, 26, and 31 of Peiler, No. 1,662,437, issued March 13, 1928; and claim 22 of Ferngren, No. 1,677,436, issued July 17, 1928. From dismissal of its bill on the merits, plaintiff brings this appeal. The appeal does not include the determination of the trial court that the claims of Peiler, No. 1,662,437, were not infringed, so that patent is not before us.

Of the claims involved, all are for apparatus (combinations) except claims 24, 25, 26, 27, and 36 of Peiler, No. 1,662,436, which are method claims. The trial court found all of the method claims and claims 31 and 33 of Peiler, No. 1,662,436 and claim 22 of Ferngren invalid. The reason for invalidity of the Peiler method claims was that they were merely for functions of the apparatus disclosed by the patent. The reasons for inva-

lidity of the Peiler apparatus claims 31 and 33 were: (1) That the claims were broader than the disclosure and (2) that they were anticipated by McCauley, No. 1,281,083 and McCauley (Brit.), No. 114,583. The reasons for invalidity of Ferngren claim 22 were that it was an amendment filed long after the original application which (1) was not merely an amplification or clearer statement of anything in the original application, (2) was not supported by the original disclosure, and (3) was not supported by the statutory oath. The court expressly abstained from ruling on the validity of all claims except as above set out.

Noninfringement was found as to all apparatus claims in suit, whether valid or not This resulted from the limitation of such claims to the particular devices disclosed— particularly those features having to do with the organization and operation of the valves controlling the three air pressures used in the feeding operation. The reasons for thus limiting the apparatus claims were: (1) They were for improvements in a crowded art which had been gradually developed over a long period of time; (2) they were limited by proceedings in the Patent Office; (3) they were limited as "paper patents, because never commercially used and too complicated for commercial use"; (4) a broad construction would result in "double patenting" as to the Peiler patents.

We will take up the issues presented by this appeal under certain general headings (with necessary subheadings) as follows: (I) The Ferngren Patent; (II) Validity and Limitation of the two Peiler Patents; (III) Infringement.

## I. The Ferngren Patent.

Only claim 22 of the patent is involved in this litigation. This claim first came into the patent during its progress through the Patent Office. It came as an amendment under the original oath to the application. The trial court determined that the claim was void because it was supported neither by the disclosure of the original application nor by a new oath. In addition to the need of a supplementary oath, appellees urged below, and contend here, that the claim is void for three other reasons: Inoperativeness and complete lack of utility; lack of adequate disclosure; and lack of novelty.

## (A) Supplemental Oath.

 The pertinent rules of law are settled. Patents are purely statutory. They are lim-

ited to discovery of things which are "new and useful" and have not been "in public use or on sale" for more than two years prior to application. USCA title 35, § 31. The statute (Id. §§ 33, 34) requires a formal application for a patent wherein the applicant shall set forth such discovery and clearly describe the novelty thereof. It requires (Id. § 35) also that the applicant shall support the declared discovery and novelty by an oath. As well said in Westinghouse Elec. & Mfg. Co. v. Metropolitan Elec. Mfg. Co., 290 F. 661, 664 (C. C. A. 2), this last section requires that the applicant "shall swear to his invention, and all of it." Therefore it is clear that any amendment made after filing the application cannot go further than the discovery disclosed in the original application unless it be supported by a supplementary oath covering the extended matter. "A claim is not a disclosure; but every claim must be justified by the disclosure. If, therefore, a new claim needs for its justification or validity an additional or new disclosure, such additional allegations of fact assuredly need a supplemental oath, not because they are to be used for an amended or new claim, but because they tell some fact of invention not told before" (Westinghouse Case, supra, page 664 of 290 F.), and "whether any given new or amendatory matter does or does not enlarge or add to the disclosure as it stood before amendment is a question of fact" (Westinghouse Case, supra, page 665 of 290 F.). Also see Cleveland Gas Burner & Appliance Co. v. American Heater Corp., 38 F.(2d) 760, 763 (C. C. A. 8).

It is this character of fact question which is the issue here. Is claim 22 for an invention broader than, or different from, what is disclosed by the specifications and drawings of this application? Although the specifications and drawings have been amended, those upon which the patent was granted do not essentially differ from those of the original application in so far as disclosure of the invention. Therefore we may examine the present question on the basis of the disclosure in the patent as granted. Claim 22 is: "In an apparatus for separating molten glass into mold charges, the combination of a receptacle for the glass having a submerged outlet, a member within the receptacle having a chamber opening toward the outlet, and having its lower edge submerged in the glass, and automatic means operating in a predetermined order and time, for periodically creating a vacuum within the chamber to prevent the discharge of glass from the outlet, and for supplying compressed air to the chamber to discharge the glass from the outlet."

The view of the trial court is: "The drawings and specifications originally filed disclosed a glass-feeding structure where the application of vacuum in the cup to draw or suck the charge from the opening of the forehearth was essential. It could not be worked any other way as the patentee expressly stated. No disclosure was made of a structure 'for supplying compressed air to the chamber to discharge glass from the outlet'. Since the patentee by his device could not carry out that process it cannot be said that claim 22 is merely an amplification or clearer statement of something in the original application. It speaks in a language of a different period of the glass-feeding art."

The Ferngren conception, as revealed by his disclosure, was not a suspended gob feed, and was not a feed directly into a parison mold. In a suspended gob feed, the amount in the charge and the shape of the charge are incorporated in the suspended gob, which then drops into the parison mold. Ferngren came into the art in 1913, before much development of the principle of suspended gob feeding, and, so far as this record shows, before an appreciation of the problems of such gob feeding. He had no such principle in mind. His conception was to segregate the amount of glass required for a charge before the charge left the orifice and then to eject the segregated charge into a cup wherein it was carried to be dumped into a parison mold. His active agency in such segregation and ejection was air force. He uses suction within a lowered air bell (located in the forehearth) to segregate the desired charge amount in the orifice tube. He uses simultaneously coacting compression in the bell to push down and pull down suction in the cup to eject the charge into the cup.

The trial court thought this claim broader than the disclosure because it included something not in the disclosure (compression in the bell), and did not include an essential feature of the disclosure (suction in the cup). We think the disclosure included compression in the bell (patent, pages 1, lines 18–20; 2, lines 8–13; and 3, lines 18–22), and therefore the court was mistaken in this respect. As to the other matter (suction in the cup), the disclosure is that such suction was to be applied, and no alternative where no such suction was to be used is anywhere suggested. This, however, is not determinative of the matter we are now considering. It is a common and permissible prac-

tice to file claims for individual features of a device, and under some circumstances such may pass to patent. Whether they should so pass may involve other questions than the necessity for an oath to an amendment, which we are now examining. As to the oath, the question is solely whether the disclosure is as broad as the claim. This disclosure reveals every element of this claim, as follows: A receptacle for glass having a submerged outlet; a member therein (the bell) having a chamber opening toward the outlet with its lower edge submerged in the glass; automatic (air force) means operating in a predetermined order and time (suction to retard or prevent and compression to increase discharge) for periodically creating a vacuum to prevent and compression to discharge glass from the outlet. It is true that the matters covered by this claim were but a part of the entire operation of the apparatus, but they were revealed by the disclosure of the application. Therefore the claim did not exceed the disclosure, and, not seeking more than had been revealed in the alleged discovery, did not require a supplemental oath.

### (B) Operativeness and Utility.

The disclosed purpose of this part of Ferngren's apparatus is to segregate in the orifice tube (or tube and bell) and from the glass in the forehearth a quantity sufficient for a charge (pages 1, lines 105–108, and 2, lines 1–6). The apparatus for doing this is revealed best in Fig. 7 and is as follows: (1) A submerged elongated orifice tube of particular shape and location (the shape is like a funnel with a short flare at the bottom, the location brings the top of the tube above the floor of the forehearth); and (2) a vertically operating air bell with an interior diameter equaling that of the tube top. The operation of the device is as follows: The bell being raised from the tube top, glass flows naturally (or may be accelerated by suction in the bell) from the forehearth into the tube, where its passage is somewhat retarded by the funnel shape of the tube; when sufficient glass for a charge has entered the tube, the bell descends to its seat on the projecting top of the tube, thus preventing further flow from the forehearth and segregating the glass in the tube as a charge ready for delivery; the funnel shape of the tube is designed to prevent flow out of the orifice while the charge is thus being accumulated and segregated, but, if the glass be very fluid, this prevention is assisted by upward supporting suction in the bell; compression is then applied in the bell to rapidly force the charge downwardly out of the tube.

■■ Appellees contend that the length of the tube (they estimate as 16 inches) would make suction ineffective as a supporting force of the glass therein unless a pronounced degree of suction were applied, and, if that were done, the glass would be sucked up into the air passage of the bell, thus putting the apparatus quickly out of commission. Obviously, the suction might be so great as to produce this unfortunate result, but that such degree of suction is necessary to retard the charge flow from the tube during the very short period of time it must be restrained is not demonstrated in this record but rests purely upon argumentative theory. All that can be said is that the matter depends upon variable factors (such as fluidity of glass and rapidity of charge), and that it might or might not be so. Facing the presumption arising from the grant of the patent, it is the duty of appellees to establish their contention by proof, and this they have not done in this respect. However, there is a feature, revealed in the disclosure, which we think does establish the impracticability of this part of the apparatus. That feature is the seating of the bell upon the upwardly projecting rim of the tube. Such seating is clearly contemplated by the disclosure (see Figs. 7 and 14) and is necessary for the segregation of charge contemplated. This seating is by descent of the bell on the raised upper rim of the tube. In practical operation, this seating must be repeated rapidly as charges follow each other in a matter of seconds of time. Both the bell and the tube must be, and are illustrated in the drawings as being, of refractory material to resist the intense heat of the constantly contacting molten glass. Such material necessarily must be some form of heat-resisting clay composition, and therefore rather frangible. It is inevitable that the frequent rapid descent of the bell upon the tube rim would readily cause chipping and breaking of either or both to the point where frequent replacements would be necessary. Replacement of either is no slight matter and would entail stoppage of the machine and drainage of the forehearth. Such a situation is not tolerable in commercial production, and the evidence is clear that no such apparatus has ever passed into construction and use. The claim, as explained by the disclosure upon which it is based, reveals an apparatus which is operable in the sense that it will actually function but which is not useful because of the above vital practical de-

fect. As said by this court in a very similar situation: "In other words, plaintiff's invention is 'new,' but it is not 'useful.' The term 'useful,' as contained in the patent law, when applied to a machine, means that the machine will accomplish the purpose practically when applied in industry. It is to be given a practical and not a speculative meaning. It means that the machine will work and accomplish the purposes set forth in the specifications. Even if the machine can be made to accomplish the purposes specified, it is not useful, within the meaning of the patent law, if from its inherent nature it will accomplish the purpose only to such a restricted extent as to make its use in industry prohibitive." (Besser v. Merrilat Culvert Core Co. (C. C. A.) 243 F. 611, 612. Also see In re Perrigo, 48 F.(2d) 965, 966 (Cust. & Pat. App.), and Houston v. Brown Mfg. Co., 270 F. 445, 448 (C. C. A. 6). Lacking that usefulness required by the statute (USCA title 35, § 31), we think this claim invalid. Because of this conclusion, we find it unnecessary to examine the further contentions of appellees relating to adequacy of disclosure and novelty.

## II. Validity and Limitation of Peiler Patents.

The matters requiring examination in connection with validity of the Peiler claims are so similar to those affecting limitation that convenience and avoidance of repetition suggest they be treated together in so far as is possible. Our plan will be: (a) A definition of the art necessary to be understood in order to comprehend and determine the issues as to these matters; (b) examination and determination of the method claims; (c) examination and determination of the apparatus claims.

### A. The Art.

It has been well said that: "It is necessary for one who wishes to grasp successfully the principles underlying the process for the production of glass on a commercial scale to possess some knowledge of the sciences upon which glass technology is founded. The three most important are chemistry, physics, and engineering." A Text-Book of Glass Technology by Hodkin and Cousen, Constable & Co., London, 1925. Our present purposes do not require an extended incursion into the very large field of the commercial production of all kinds of glass, but it is necessary briefly to scan this field in order properly to under stand the art of our immediate concern and to appreciate the contributions of various cited devices to that art.

Two matters should be noted at the beginning. The first is that the problems of chemistry, physics, and engineering—all of which are involved in any process of glass making—arise partly from the character (size, shape, and uses) of the article to be produced and from the conditions governing such production. The second is that there is a like sequence of general operations or steps in all processes. The first of these implies dissimilarity while the latter implies similarity. The natural result of the combined influences is that there are differences within the elements or steps of the sequence without disturbing the sequence. Broadly speaking, this sequence in mechanical (also called automatic) processes consists of four general operations: (1) Selection of the proper chemical substances, mixing thereof in correct proportions, and putting the mixture in a fusing receptacle; (2) fusing of the mixture into an harmonious fluid mass and conditioning (mainly "fining") for working; (3) transfer (called "feeding") from the fused mass to the forming apparatus, of a portion suitable for the particular working; and (4) "working" into the desired article. In each of these steps an "art" exists. It is within each of these steps that there occur those divergences or differences caused by the character (size, shape, and use) of the article to be produced, or worked, and by the conditions governing such production, or working.

Our interest is in the third step in the sequence—that of "feeding." But our particular concern is more concentrated than upon the art of feeding glass for making glass articles generally. The patents here in suit have to do with feeding glass to be blown in molds to make glass articles—mainly bottles and narrow mouthed ware. The size and shape of such articles and the peculiar conditions (blowing in molds) governing their manufacture cause a divergence or difference from feeding methods for many other glass articles. For example, a considerable quantity of glass may be taken from a fusing furnace by ladle, pot, or pouring and placed on a large forming table when plate glass is to be rolled; a window glass cylinder may be blown from a fair-sized open pot into which the molten glass has been ladled or has flowed from the melting furnace; for large ware (formed by pressing in molds) the desired quantity of glass for a piece of ware may be taken in various ways from the furnace and placed in the wide open mold; while for bottles or similar ware blown in small-mouthed molds a particularity of quantity and shape

of feed charge is required which is not of interest in the making of many other articles. These differences in requirements in the feed produce differences in problems of feeding which have led to distinct branches of art within the general art of feeding glass. Not only this, but wide differences in principle of methods for feeding to molds for this kind of blown glass articles have revealed very different problems and required thought for solution along such different lines that there has arisen a further branching of art within the art of feeding to such molds. In the last analysis our special concern is with a particular principle or kind of feeding to molds for blowing glass bottles and similar ware; that is, the art of "suspended gob" feeding.

Having indicated the related arts and the particular art with which we have to do, it is necessary now to state certain matters which influence, with somewhat varying force, all glass feeding and those peculiar to or more potent in feeding to molds for blowing bottles.

Glass is an amorphous chemical compound created by fusing in a furnace. The chemical constituents and problems of glass, while always very important, are outside our concern, but the compound has certain physical characteristics important here. With some few exceptions (mainly optical lenses) not of consequence here, glass is "worked" into the finished article while in a molten state. Its physical characteristics while in that state naturally influence or control the methods in which it can be worked and fed. The extent of such influence or control varies with the kind of article to be made. For the kind of articles which here concern us, the characteristics we need specially to notice are two. The first is extreme viscosity (increasing rapidly with loss of temperature) with a pronounced tendency to adhere to anything it touches—particularly if the thing be hot. The second is the rapid formation of an enveloping "skin" when exposed to temperatures cooler than itself. While it is probable that all liquids (due to internal molecular attraction) form this surface tension or skin, yet the decided viscosity and the extreme susceptibility of molten glass to temperatures cooler than itself cause the rapid formation of a relatively tough skin of a nature to affect the working and feeding of it at atmospheric or near atmospheric temperatures. These characteristics deeply affect most methods of feeding and working glass into comparatively small mold-blown articles, such as bottles.

Another matter is that "feeding" is an intermediate step in a continuous and fairly rapid sequence beginning with melting of the compound and ending with working into the product. Being the connecting link (in a continuous process) between the molten mass in the furnace and the subsequent working, the engineering problems of methods and means of feeding have inevitably been strongly influenced by the kind of furnace at one end and by the kind of working at the other. For example, it would be impractical, if not impossible, to have any kind of feed from a pot furnace except some form of dipping therefrom—such as by punty, ladle, or suction. Again, *working* methods are controlled by the character of article made—thus plate glass is rolled, window glass is blown or drawn, flat ware is pressed in molds, bottles and hollow ware are blown in molds. Necessarily, each of these methods of working has vitally conditioned the methods and means of feeding for its particular purpose. While the influence of the furnace has been nowhere near as great as the working methods (as will hereinafter appear), yet both are to be kept in mind, for furnaces and working methods had mechanically been improved and were highly developed before mechanical feeding attracted much serious attention; therefore it was into such a situation that most mechanical feeders were designed to fit. In fact, the purpose of the patents now in suit is to supply, mechanically, the link between developed furnaces and developed working mechanisms.

In connection with what has just been said, it will be helpful, briefly, to state the development of this situation in so far as bottle forming processes are concerned. Such history will throw light on the feeding needs and requirements to meet which most mechanical feeders were devised and upon some of the conceptions and devices (cited in this record) which arose to supply these needs and requirements. Making bottles and similar hollow glass containers by blowing is a very old process. Before mechanical means for so doing appeared, this was done by men with few and crude tools. This process required the closely consecutive action of several skilled workmen. It was slow, expensive, and produced bottles lacking in uniformity of size, shape, and workmanship. In this hand process, the glass was taken from the furnace (through a furnace hole above the glass level) on a slightly knobbed and hot end of a small metal pipe which was twirled to accumulate and to separate from the furnace mass a portion of glass, called a "gather." When the amount of glass estimated by the workman as proper to make the bottle had been thus

gathered and removed from the furnace, other workmen took the pipe and shaped the bottle by blowing and manipulating the gather. Other workmen broke the bottle from the blowpipe and shaped and strengthened the bottle mouth. The first development in this age-old process was along the line of tools to lighten the physical strain on the workers or to produce better and more uniform bottles. One of the latter sort was the introduction of molds in which the workman blew the finished bottle to better and more uniform shape and size. A step in this use of molds was for the workman roughly to shape the gather before it was placed in the mold for blowing. This shaping was done by manipulation of the gather on a slanting stone or metal slab called a "marver." When the gather had thus been shaped for the blowing mold, it was called a "parison." The next progressive step was to do away with this initial shaping on the marver by introducing a separate initial mold wherein the gather could be directly placed and would quickly form the "parison" deemed desirable for use in the blowing mold and from which the parison was transferred on the pipe by the workman to the blowing mold. This initial mold was called the "parison mold." This term should be borne in mind for subsequent mechanical development preserved these two molds—parison and finishing (or blowing)—and mechanically placing a charge by a feeding device into a mold means always into a parison mold. Shortly afterwards, came the first mechanical improvement through a machine to blow the bottle (in the finishing mold) by compressed air. At this stage, it was possible to dispense with the skilled human blower, and the blowpipe gave place to the "punty," which was a rod with a particularly shaped knob at the gathering end. But the

gather from the furnace, the placing thereof into the parison mold, and the transfer of the parison therefrom to the finishing mold still required manual labor. Following developments resulted in multiplication of pairs of parison and finishing molds into mechanical units with synchronized mechanical transfer of the parison from its mold to the finishing mold. Such machines were called "semi-automatic," since they still required human agency in the process, but this agency was now reduced to gathering the charge from the furnace and placing it in the parison mold. As these machines were perfected and became more rapid in operation, the defects in this manual feed (waste through inaccuracy in the quantity of the charge, slowness of operation, and expense) were more and more acutely felt. This was the developed situation which called for relief from this manual feed and resulted in much effort to devise mechanical substitutes therefor.[1] Some devices (illustrated by citations in this record) were not confined to feeding apparatus, but covered molding machinery and some even annealing, but the majority of the citations here are for feeding devices intended to meet the above situation and need.

Another matter (mentioned above in outlining our particular art and also set out in the concluding sentence of footnote[1]) is an important and a somewhat surprising thing which occurred in the efforts to devise mechanical feeding machines for bottle making molds. This is the difference not only in devices but in "principles" of action thereof. Of course, all principles had in view to remedy, mechanically, those defects in the hand gather which made that method ineffective in the economical and rapid commercial production of bottles by machinery. However, the conceptions of the method of doing this dif-

---

[1] It is not meant that this problem had received no attention until the molding and blowing machinery had reached a high stage of development, but that such advanced development created the sharp need for relief which aroused effort and produced results. In the excellent book of Hodkin and Cousen, "A Text-Book of Glass Technology," quoted from above, is: "With the successful introduction of rapid semi-automatic bottle-making machines came the need for automatic methods for delivering the molten glass to the machines. It is interesting to note that even as early as the year 1885 an attempt was made by Messrs. Rylands of Barnsley to design a feeding apparatus, though with only partially successful results. At this period the rate of production of the bottle-making machines employed did not warrant the use of a mechanical method of supplying the glass. Indeed, the added difficulties connected with the introduction of feeding devices more than counterbalanced any advantages in their favor." Page 424.

"It is not surprising, therefore, that little more was attempted in this direction until a rate of working of bottle-forming machines such as to render hand-feeding difficult was attained. This rate of working was reached about the close of last century, and in 1901 the first successful feeding device was invented by Homer Brooke. Since then, and particularly during the past few years (from 1917), a number of devices, based on varying principles, have been patented." Page 426.

fered widely. In part this may be explained by lack of knowledge of some of the problems engendered by substituting machinery for the intelligently directed action of a skilled workman and in part by lack of knowledge of the reaction of molten glass to mechanical control. There are numerous examples of the former and some of the latter. As to the first, the necessities of an accurately measured or quantity of charge and rapid delivery of charges were generally appreciated, but the necessity of shaping the charge so that it would cleanly enter and accommodate itself to the parison mold was entirely outside the knowledge or endeavor of quite a few of the inventions cited herein. A failure early to recognize this necessity of shaping was not unnatural because shaping was a problem first brought to light in mechanical feeds. In the hand gather, the skilled attention, judgment, and action of the workman had taken care of the proper introduction of the charge into the mold. In quite a few of the patents cited here, the sole design was to deliver accurate *quantities* of glass to the molds rapidly, and this is true even where the devices of some such had, within narrow limits, an entirely unintended shaping effect; that is, the action of the apparatus changed the natural form of the charge to some other which was fairly constant. Naturally, this accidental shaping might or might not be an advantage according to the circumstances—such as mold mouth, bottle size, etc. Another matter not always appreciated was the necessity of timing or synchronizing the delivery of the charge with the movements of the molds into feeding position. An example of ignorance of molten glass reaction under control is shown by Cleveland, No. 901,881, which is a stream feed where the charges are separated by stopping the outflow orifice with the shears between the end of one charge and the beginning of another. Such action would inevitably and speedily result in stopping operations through smearing of the shears and orifice. But, whatever the causes therefor, the important things are the facts that such feeders were devised along different principles, and that such principles, in some instances, developed basic problems of control peculiar to themselves. Therefore, some of these principles developed subsidiary arts of their own because of these differences.

Recognition of and acquaintance with the differences in these various principles are quite important in estimating the contribution of a given device to the art of bottle machine feeding. This is true because each principle gave birth to problems often peculiar to it; invention was inevitably controlled by these problems; and apparatus must be adapted to solution thereof. Therefore, while a device may be a decided contribution to discovery along its given principle, it may mean little or nothing to an investigator along some other. Although this may be self-evident it may be useful to emphasize and illustrate this now by several examples, as follows: Some form of shearing or definite separation of a charge from the furnace mass would seem a necessity, but Severin provides none, and the cup-shear of Brooke could suggest nothing useful to an inventor working along any principle other than the "stream" feed. Again, a forehearth, or furnace extension, is a necessity to most principles, but Severin uses none, and neither Owens' revolving pot nor Hitchcock's extended passage carry help as to forehearths to any other inventors in this record. Again, the main problems in most principles—to secure a measured or a measured and shaped charge to be transferred into the parison mold—are not encountered by Owens and Severin, who introduce a furnace mass portion directly into the parison mold.

This difference in principles and resulting methods has, naturally, led to endeavors to classify feeders to bottle blowing molds. This classification has been attempted both outside this record (see "A Text-Book of Glass Technology," supra, p. 426) and within it. Such classifications are useful, but must be used with caution because they differ as to bases, because some devices do not readily fit into any one of such classes, and because considerable significant subclassification is demanded if any one of them be adhered to. We will use such only in so far as seems advisable to make our meaning clear.

From what has been said it is evident that, broadly speaking, the practical engineering problem involved in all mechanical glass feeding is that of control of the glass for the purposes of the feed; that the control requirements differ according to the article to be made and the methods of making such article. Also it is clear that these requirements as to bottles (which are made by blowing in molds) are accuracy of quantity of charge, shaping of the charge to enter and fit the mold, rapid succession of charges, and synchronizing the time of charging to the movement of the parison molds into charging position. Also that attempts to devise feeds for bottle machines have been along different lines presenting different problems meaning different solutions and solutions meaning methods (or conceptions) as to the

way of solution and also apparatus to carry such methods into effect. We are now to state (in so far as here helpful) the general considerations and means of control. It is with such that this case is vitally concerned.

Broadly, control has to do with movement of the glass from the furnace mass into the parison mold. It is obvious that the fluid or semifluid condition of molten glass in the furnace is always affected by gravity, and, therefore automatic transfer (movement) of a charge from the furnace to the parison must reckon with this omnipresent natural force. Thus automatic control must involve forces which will result in some one or more of several effects: Overcoming, using, accelerating, or retarding gravity. In respect to such effects, the requirements in this movement from furnace to mold may differ or may differ at various stages in the progress of such movement—depending upon the principle of feeding. Thus, the Owens device is concerned only with overcoming gravity; Bridges, No. 1,121,608, utilizes gravity (twice) and overcomes gravity; Wilzin (Fig. 20) accelerates gravity; McCauley, No. 1,281,083, overcomes and accelerates gravity; McCauley, No. 1,-322,318, overcomes, retards, and accelerates gravity; Lott (Fig. 29) utilizes gravity and (Fig. 30) overcomes and utilizes gravity; Miller utilizes and accelerates gravity. The differences in the above examples (there are many others) suggest the wide possibilities of divergence in the use of these four effects and in the sequence of use where more than one is employed.

The automatic means for exercising force to affect gravity in the glass movement are of two kinds: Mechanical and pneumatic. The character of each of these has affected the methods and apparatus for control. For example, Owens and Severin principles are based upon pneumatic force, and would be impossible mechanically, while Peiler's paddle-dam feed method is just as strongly based upon mechanical means with impossibility of pneumatic accomplishment. On the other hand, certain feeding principles are susceptible either to mechanical or to pneumatic control, and some principles (such as the suspended gob feed) may employ either at the same stages and for the same purposes.

Having put in the above general background, which we think will be helpful in understanding the Peiler patents in suit and the effect of the citations against them, we turn to these Peiler patents. After stating the broad scope thereof, we will examine the citations and their effects—first upon the method claims and then upon the apparatus claims.

### Peiler Patents.

The applications for these patents were filed on the same date and took serial Nos. 396,934 and 396,935. The first of these (as granted) covered both method and apparatus. The second purely apparatus. The later numbered application first received patent, being No. 1,405,936, issued February 7, 1922. Patent on the other was issued March 13, 1928, being No. 1,662,436.

These patents are upon the principle of a "suspended gob." This principle rests upon the conceptions that the viscous and skin forming characteristics of molten glass at proper working temperatures cause it to flow from a limited submerged orifice in connected drops or "gobs" instead of in a consistent stream; that, under normal gravity flow, these gobs assume a characteristic shape which is that of filling out at the bottom and continuously tapering toward the top (called "tad-pole" shape); that the size (quantity) and (within useful limits) the shape of such gobs can be controlled through the coacting influences of the diameter of the orifice and the exertion of force (expulsive and retractive) above and at the orifice upon the glass issuing therefrom and in suspension. Generally speaking, the broad problems of suspended gob feeding are to measure and to shape the gob while it is in suspension. The particular concern of these patents is with the shaping, although, of course, they also cover measurement. Therefore we are concerned with the principle of "suspended gob" feeding and particularly with the shaping of the mold charges.

The theory of shaping a suspended gob charge for a mold is as follows: As fast as the surface of the issuing gob is exposed to the much cooler temperature, a tenacious and somewhat elastic skin forms. If compression is applied to the unissued glass above and within the influence of the orifice, it can be made to flow into the gob inside this skin, with the result that it "stuffs" the skin and changes the natural form of the gob. A reversal of this force tends to restrict and may even, temporarily, prevent flow from the orifice.

The benefits of proper shaping are important in their effect upon the finished ware. These benefits are clean entrance of the charge into the mold and its accommodation to the mold. Difficulty of entrance results in trouble and loss which is obvious. By accommo-

dation to the mold is meant the lack of overlapping because any overlapping skin on the charge must be absorbed therein to prevent defects in the finished article, and such complete absorption is difficult under the temperature conditions existing in the mold and produced by the contact of the mold with the charge.

Another matter in connection with shaping is brought about by the necessity for definitely separating the charge. The tenacity of glass causes it to adhere strongly to itself or to objects it contacts (increasing with the temperature [heat] of the object). Cleanly to separate a charge it is necessary to use some form of shearing. To aid in ready shearing and to avoid harmfully smearing the shears or orifice or both, it is desirable that the charge, at the shearing line, be small. A related matter is occasioned by the situation that time must be given for a shift of molds after each charge, and, if the stub on the following charge made by the shearing is exposed to cooling during that time, it will not readily be absorbed therein, and will cause a defective article. Hence the desirability of reheating this stub.

From the above considerations it is clear that, usually, the desirable situation is that of maintaining a uniform shape of a size readily to enter the mold and conform thereto with contraction for shearing and retraction of the upper stub for reheating.

In these two patents, Peiler expressly recognized that he came into suspending gob feeding at a time when the art revealed the major problems of such feeding and when devices had appeared to solve such. He says: "Various machines have been provided for this purpose [to separate and deliver a series of masses of glass of suitable size and shape to serve as mold charges] in which the container for the molten glass is provided with a submerged outlet, and the flow and cessation of flow is caused by extruding and intruding impulses imparted to the glass in or near the outlet. In some of these machines, the impulses are produced by changes in the air pressure on the surface of the glass near the outlet; that is, the air above the outlet may be compressed above atmospheric pressure to cause extrusion of the glass, and reduced to a partial vacuum to cause a cessation of the extrusion, or in some cases, an intrusion of the extruded mass, or of the stub left after severance. The gather is suspended beneath the outlet, and shears are usually provided to sever the mold charge from the gather. In this way, a series of charges is formed of a size dependent in part on the pressures and

their duration, of the application of the abnormal air pressures, and these charges are of uniform size and shape so long as all conditions remain constant" (No. 1,405,936, page 1, lines 17–40, and also same matter No. 1,-662,436, page 1, lines 10–31). Thus he knew that the art taught shaping of suspended gobs by variations in air pressures near the outlet.

His effort was directed to three of the problems which concerned such shaping through variation in such pressures. He recognized that it was advantageous to have the charge shape conform to some extent to the shape of the mold and that molds differed in shape; also that it was advantageous to maintain this charge shape uniformly during the feed to particular molds and that unpreventable changes (such as variations in viscosity of the glass) in the working conditions might arise during the feed which would affect maintenance of this uniformity of charge shape. Therefore his efforts were directed toward (1) shaping a charge to conform to the mold shape; (2) varying the charge shape to conform to different shaped molds; and (3) varying the effect of the charge forming force during a feed to overcome changes in working conditions and thus keep the shape of the charge uniform. The first of these purposes he sought to accomplish through a sequence of air pressures active at the orifice and a machine to create and control such; the second and third by providing adjustments of the mechanism creating and controlling the air pressures. His method claims in No. 1,662,-436 cover the sequence and duration of pressures. His apparatus claims in both patents cover the machines and their adjustments.

While the quantity of a charge is a prime essential in any mold feeding and while Peiler makes reference thereto in his vertical positioning of the air bell (No. 1,405,936, page 2, lines 84–87; 1,662,436, page 2, lines 38–43) and in stating the importance of periodically stabilizing abnormal pressures (No. 1,662,-436, page 5, lines 68–93), yet his real concern in both patents is with the shaping of the charge. He knows and states (No. 1,662,-436) the general effects of pressures over an orifice in a suspended gob feed to be that the diameter "of that portion of the gather then being extruded" (page 2, lines 88–89) may be increased by pressure causing "a more rapid extrusion" (page 2, line 65) of glass from the orifice; that reduction of pressure "decrease the diameter of a corresponding portion of the gather" (page 2, lines 68–70); that, if such reduction be to normal, "gravity will produce a thinner or neck portion" (page 2, lines 91, 92); that, if such reduction be to

below normal, the flow will "decrease and finally stop, and may become an intrusion" (page 2, lines 94, 95)—each of these affecting the shape of the gob. He recognizes that the shape may be further and more particularly controlled through the manner, time, and duration of these various pressures. Thus he states that shape may be "still further varied by the rapidity with which the air pressure is changed, and an important factor in determining the shape of the gather is the relative time of application and duration of the various pressures" (page 2, lines 96–101). Recognizing and intending to utilize all of these elements in the control of shape, and having in mind the advantages of variation in shapes for different shaped molds and of overcoming working condition changes in order to maintain uniformity in the charges of a given feed, he presents, in these patents, his method and two forms of devices of considerable adaptability and mobility of operation. Anticipation is directed both at the method claims and at the apparatus claims.

(B) Method Claims.

Obviously the question of anticipation of the method claims of No. 1,662,436 differs in character from that of anticipation of the apparatus claims of the two patents. We examine first the method claims (set forth in the footnote[2]).

■ Of these, claim 27 is clearly for a function. Its differentiation from the other claims has for its purpose the proper working of the particular apparatus. It aims at stabilizing the abnormal pressures (under operation) and thereby preventing the building up of abnormal pressure beyond that intended for operation. Such undesired increase might result in affecting the quantity of the charge (if either compression or suction) and in crippling the machine (if suction). The place of this claim, as defined in the specifications upon which it is based[3], seems purely a function and no part of the shaping of a suspended gob.

---

[2] "24. The method of separating a mass of molten glass in a container having a submerged outlet, into mold charges, which includes the steps of regulating the movement of glass in the outlet by the application of pneumatic pressure above and below atmospheric to the surface of the glass over the outlet for definite periods of time, and periodically exposing said surface to atmospheric pressure for definite intermediate periods of time of measurable duration.

"25. The method of separating a mass of molten glass in a container having an outlet, into mold charges, which includes the steps of periodically and successively applying three different pneumatic pressures, each for an appreciable substantial period of time, to the surface of the glass to regulate its movement in the outlet.

"26. The method of separating a mass of molten glass in a container having a submerged outlet, into mold charges, which includes the steps of exposing the surface of the glass over the outlet to a pressure above atmospheric, a pressure below atmospheric, and an intermediate pressure, all three pressures being of substantial duration.

"27. The method of separating a mass of molten glass in a container having an outlet, into mold charges, which includes the steps of periodically applying two different pneumatic discharge-regulating pressures other than atmospheric to the surface of the glass over the outlet each for a definite period of time, and applying a uniform stabilizing pressure for a definite period of

time of substantial duration between the applications of regulating pressure.

\* \* \* \* \* \*

"36. The method of separating molten glass into mold charges, that comprises permitting glass to flow through a discharge outlet under substantially normal atmospheric pressure for a measurable period of time to form part of a mold charge, then applying super atmospheric pneumatic pressure to the surface of the glass to accelerate the discharge of glass through outlet and thereby to complete and shape the charge, and thereafter subjecting the surface of the glass to sub-atmospheric pressure, also for a definite period of time, to retard the discharge of glass from said outlet."

[3] After stating "There have now been described three valves which have been named, for convenience, the vacuum, atmosphere and compressed air valves. These may be set to act in any desired sequence, the preferred arrangement being (1) atmosphere to start the discharge of the gather, (2) compressed air to cause a more rapid discharge, and (3) vacuum to stop the extrusion and, if desired cause an intrusion of the stub after severing" (page 4, lines 53–63), the specifications continue: "In order that normal pressure may be restored after the occurrence of vacuum as well as compressed air, if so desired, a second means is provided for restoring the chamber in the bell 31 to atmospheric pressure. This means may comprise a vent to the atmosphere from any convenient point in the conduit between the valves and the

■ Claims 24, 25, 26, and 36 (broadly stated) claim the application of three pneumatic pressures using each for an appreciable duration. Claim 25 is so general and indefinite as to convey no useful information as to what the method is. It gives no sequence and no general definition of pressure. It covers all sorts of sequences and all sorts of pressures. Three different degrees of compression or three such of suction or two of compression and one of suction or two of suction and one of compression, or two of either compression or suction and one of gravity, or one each of compression, suction, and gravity, each would read on this claim. The claim is invalid because so indefinite and general that it conveys no useful information to one skilled in the art.

Claim 26 is a little less general than claim 25, but not sufficiently definite to survive. It is less general than claim 25, in that it identifies the three pressures as compression, suction, and "an intermediate pressure" (page 7, line 126). But it indicates no sequence of these pressures, and a pressure described as "intermediate" between compression and suction may mean either atmosphere or, possibly, some lesser degree of either compression or suction. The normal meaning would be atmosphere, but a careful comparison of the differences between these five method claims and certain expressions in the specifications (page 3, lines 49–55, page 3, lines 126–131, and page 4, lines 1–3; particularly page 5, lines 75–80) convinces that both meanings are in the mind of the inventor.

■ Claim 24 is more definite. The three pressures are identified. There is something of indefiniteness in the sequence. This uncertainty arises out of whether the contemplated use of atmosphere for "intermediate periods" provides for three or for four steps in the sequence. If four, the sequence would be atmosphere-compression-atmosphere-suction. In such sequence of four pressures, atmosphere used after compression is *useful* solely to stabilize the applications of abnormal pressure—such use is functional. It is true that such use of atmosphere will affect the shape of the charge but that effect is not desirable, but, to a degree governed by the duration of this pressure, harmful to correct shaping. This harmful tendency is clear if we recall certain matters. The sole reasons for shaping a suspended gob are (1) to cause all of the gob to enter the mold cleanly and (2) to cause it to accommodate itself in and to the mold without overlapping on itself therein. Shaping is employed to correct those defects in the form of a natural (gravity, or atmosphere) gob which prevent such clean entrance into, and such accommodation in, the mold. We have here to do with the effect on the gob shape of atmosphere following compression. Compression is used to fill out the upper parts of the gob and prevent the attenuation or diminution of diameter which occurs in the natural gob at these stages—it is to prevent the attenuated portion which causes overlapping in the mold (such overlapping resulting in defective articles). Thus it is clear that it is undesirable, from a shaping viewpoint, to have attenuation at the upper part of the gob, and that the only purpose

bell. As shown in Figs. 2 and 3, a pipe is connected at the junction of the pipes 46 and 47 and provided with a check valve 102 and a throttle valve 103. The check valve is arranged to close when the conduits are connected with vacuum, but when pressure exists in the system, the check valve opens and permits the constant escape of a relatively small quantity of air. When the valve 50 has been closed to cut off the supply of compressed air, this leakage reduces the chamber of the bell 31 and the conduits connected therewith to normal atmospheric pressure in a time dependent on the adjustment of the throttle valve 103. It will be obvious that this throttle valve or any of the other valves 87, 88, 93 and 94 may be closed to render the connection with any source of pressure inoperative if desired. * * *

"An important advantage resulting from the periodic application of an intermediate stabilizing pressure between the vacuum and compression, is that each application of compression or vacuum is started from a uniform basis, without first having to neutralize the previous pressure before becoming effective in its own capacity. This intermediate pressure is preferably the normal pressure of the atmosphere, although satisfactory results may be obtained by the use of an intermediate pressure somewhat above or below normal atmospheric pressure. This intermediate stabilizing pressure overcomes the tendency to build up compression or vacuum during successive applications, which tendency results in a gradual raising or lowering of the level of the glass over the outlet and a corresponding variation in the weight of the mold charges separated therefrom. This insures that each pressure shall be exactly that intended, without being affected by variations in the previous pressure, which may be cumulative, and gradually cause considerable variation in the weight of the mold charge."

for using compression to affect this upper part is to prevent attenuation. Gravity (which is the effective force at atmosphere) tends to cause extended attenuation, and the only possible purpose or effect (connected with shaping) of using it following compression would be to narrow the charge. It is desirable to narrow the gob at its extreme upper end, but this arises from a reason entirely unconnected with shaping. The gob must be definitely severed, and the reason for narrowing the charge is to present less area of glass to be severed and thus decrease the probability of smearing the shear blades (thus interfering with their proper functioning), to reduce the size of the stub to be withdrawn and reheated, and, possibly, to prevent deflection by action of the shears of the upper end of the gob from clean entrance into the mold. Since attenuation is detrimental to the gob shape in proportion to the length of the attenuated part, and since diminution of diameter is desirable for shearing, it is obvious that the more abruptly this diminution to the desirable shearing diameter can be secured the better it will be. Since suction can be made to act more abruptly than the constant force of gravity, clearly it is a more useful force in this diminution. Peiler clearly understood all this, and such knowledge was old in the art. Clearly the best results (well known to Peiler and to the art) would come from the most rapid change possible from compression to suction. Harmful results were sure to follow any unnecessary delay in such change and in the degree that such delay was prolonged, that is, the extent to which gravity was given control at this stage. Now, the expression in this claim that the use of gravity is for "definite * * * periods of time of measurable duration" cannot mean the least possible period in passing from compression to suction—it means a period during which gravity alone would exert an influence on the gob, and such influence would mean extension of the attenuation. Clearly, there is no useful effect upon the gob from such extension. If it has a usefulness, it is solely as stabilizing the functioning of the two abnormal pressures. But the inclusion of a function in the statement of a method does not invalidate the claim if what is left after exclusion of the function constitutes a method. This is particularly true where, as here, the function appears in what

may well be an alternative place in the claim and where the claim, with the functional portion eliminated, is complete. The claim may be sustained as one for a sequence of atmosphere-compression-suction with definite duration of each, since it will well bear that construction. But, so construed, it is in effect the same as claim 36.

The differences between claims 24 and 36 are, first, that claim 24 described the gravity pressure as "atmospheric pressure," while claim 36 reads "substantially normal atmospheric pressure," and, second, that 36 describes the purposes and order of the forces. Both differences are unsubstantial. There is no substance in the difference as to extent of pressure. The very nature of suspended gob feeding, where the three pressures are used, necessitates the order of sequence and for the very purposes set forth in claim 36. In this respect, claim 36 merely particularizes matters which any glass man would instantly understand where the three pressures were to be used in this sequence in a suspended gob feed. From what has been said concerning the natural shape of a gob feed and the reasons for and the stages at which corrective shaping is desirable, it is clear that a sequence of atmosphere-pressure-suction, each for definite periods of duration, is a useful method of suspended gob feeding. Therefore claim 36 and claim 24 (as above construed) are valid method claims unless they have been anticipated. Nor is there anything in the Patent Office record of these patents or of admissions in interferences involving them to prevent this conclusion.

One matter needs to be noticed before examination of the citations against these claims. That is the meaning of a definite period of duration for the exercise of each of the pressures. The main thing which made mechanical mold-blowing feeds necessary was the inability of the hand feeder to keep up with the presentation of molds for feeding. Mechanical feeders must, if commercially useful and attractive, be relatively rapid in delivery of charges to the molds. While the degree of rapidity varies with certain practical considerations[4], we need notice only that it is very rapid—running as high as thirty delivered charges per minute. That is, each charge is begun, formed, and delivered all in a period of seconds. Consequently, the dura-

---

[4] Some of these practical considerations are size and shape of the article to be made (controlling size of mold and of mold opening) and, where feeders are to be substituted in existing semiautomatic situations, the speed movement of the particular mold-shifting device and the number of such devices being used from one furnace.

tion of any of the three pressures used to form a single charge is much less. But it is not controlling that such duration—measured by the clock—is very brief. The important thing is that such duration shall be enough to exert an independent influence upon the shape of the charge. If it continues "for definite periods of time" or "for definite * × ˟ periods of time of measurable duration," as provided in claim 24, it must necessarily exert a forming influence on moving glass. Claim 36 is somewhat more specific as to this duration: as to atmosphere it is "for a measurable period of time to form [the early] part of a mold charge"; as to compression it is long enough "to complete and shape the charge"; and as to suction it is enough "to retard the discharge * * * from said outlet." Thus the duration of each pressure is stated in terms of its purpose or effect. Such standard is clear to any glass man. If it were not, the drawings and specifications would make it clear—in fact, they make very definite these periods of durations as being: gravity to start and form the lower part of the charge; compression to maintain the diameter of the charge so started and formed; suction to contract the completed charge for shearing and to retract the upper stub for reheating and absorption.

Are these two claims anticipated? Clearly the same considerations control both. We are cited to numerous glass-feeding devices.[5] We have painstakingly examined and re-examined every one of them. Some of them are not for mold feeds and some are for mold feeds where the article is to be made by pressing or other than blowing—these are not helpful here because shaping of the charge for a parison mold is an entirely different problem; in some, shaping is not a requisite and in some is not possible; and in some even exact quantities of feed are not essential. Among the mold-blowing feeds, some do not have a submerged orifice and no material shaping of the charge before introduction into the parison mold has been shown, in this record, to be practicable without such orifice. Others using a downward orifice offer no assistance here, for they carry no suggestion of shaping, and some of such could not be adapted thereto. Some use mechanical instead of pneumatic force and are not helpful because we are dealing in these method claims solely with pneumatic force.[6] Others which come within our immediate art of suspended gob feeds and which use pneumatic force for separating the quantity for a charge, for shaping, or for both, do not teach the use of three pressures—such are undoubtedly very educational as to the action of gobs and the effects of pneumatic control thereof and thus, while they approach, more or less closely, our problem, they fail really to enter it. However, there are two citations which bear directly: Howard, No. 1,315,668 (French, No. 486,623) application for which was filed July 22, 1916, and Howard application serial No. 180,795, filed July 16, 1917 (passing to patent No. 1,-797,206, on March 17, 1931).[7]

---

[5] These citations include Owens, No. 766,768; Severin, No. 984,974; Bridges Nos. 1,121,608 and 1,590,924; Cleveland, No. 901,881; Hitchcock, No. 805,068 and reissue No. 13,929; Rau, No. 1,151,393; Wilzin, No. 1,174,217 and (French) No. 439,150: Lott, No. 1,382,994; Miller, No. 1,642,967; McCauley, No. 1,281,083 (British No. 114,583), No. 1,322,318 (British No. 113,665) and (British) No. 135,454; Harding No. 1,150,030; Howard, No. 1,-138,110, No. 1,315,668 (French No. 486,-623) and application serial No. 180,795; Peiler, No. 1,573,742 and "single feeder"; Drawings from Brooke No. 723,983; two pages from National Glass Budget for June 30, 1917, concerning a Howard device; and various drawings from other litigated actions.

[6] While Peiler says that impulses "in or near the outlet may be produced by mechanical means" (page 2, lines 71, 72), he adds "but the present invention contemplates the practice of this method by pneumatic means" (page 2, lines 72–74). All of the method claims are based on pneumatic pressures, therefore, this question as to anticipation of the method claims is concerned only with uses of pneumatic pressures. Clearly, the problems of mechanical and of pneumatic shaping are essentially different in the respects involved here. See Howard, No. 1,315,668, and Howard application serial No. 180,795.

[7] Appellees place reliance on the earlier Howard, No. 1,138,110, because, they contend, the three pressures are used. This device was not a true mold feed in the modern sense. It is mainly useful in connection with feeds for plate and window glass purposes. While it was designed for use in bottle mold-blowing manufacture, Howard had in mind only the initial step in a particular type of mold-blowing machinery; i. e., the suction method of Owens which used a revolving pot as a species of forehearth from which to take the charge. Howard intended and went no further than furnishing a means to get the glass from the furnace into the pot. Shaping was not.

Howard, No. 1,315,668, is a purely method patent for a suspended gob feed. He recognized that gob charges were formed by varying pressures of a mechanical plunger above a submerged outlet orifice of a supply reservoir. He thought the use of mechanical plungers had four named practical defects (page 2, lines 16–46). He designed to express a method by which these defects were eliminated. This he did by substituting air (for mechanical force) caused to operate in a way which lacked these defects of the mechanical plunger method. The defects he conceived to be in the plunger method were: (1) Dissipation of force; (2) checking rate of gravity flow ("even in some cases reversing it in the orifice tends to cause clogging" [page 2, lines 27–29]); (3) imperfect incorporation of upper severed stub; and (4) no provision for varying flow to correct supply level or changes in temperature and viscosity (such defect being inherent because "the forces accelerating the flow at one time are balanced by an equal checking force, and thus the average flow is not different from the normal flow when these actions are suspended" [page 2, lines 37–41]). Howard's method of providing a gob-forming feed to obviate these defects was a tubular member relatively sized to the orifice and adjustably placed from somewhat closely above the upper opening of the orifice to below the lower end thereof. Such placing, he judged, would result in a never impeded gravity flow which would take the form of a "doughnut" as it issued naturally—the orifice walls forming the outside thereof and the tube the central hole. Suction is used in the tube (1) to build up a column of glass therein with which to "stuff" the charge; (2) to narrow for shearing and retract the stub; and (3) if sufficiently rapid, to accelerate the gravity flow into the doughnut. The stuffing may be by the accentuated gravity in the column or yet more by compression on the column. He is very solicitous that gravity flow from the reservoir be unimpeded. He provides for suction and compression. The important matters here are whether he provides for a period when gravity

alone operates and, if so, its place in the sequence of force applications. His drawings include only such parts of apparatus as necessary to define his method. They have to do only with an orifice, a control tube, and the shapes of charges at different stages of formation. No apparatus to produce the pneumatic pressures he uses is shown. A study of the figures and parts of the specifications convince that gravity is used as a separate force in forming and shaping the gob; is used at the beginning of the gob; and for a duration affecting the shape of the gob. To understand what takes place at the initial formation of the gob it seems best to examine what precedes and what follows that stage—thus getting the setting of that stage in the entire operation of forming a gob. To do this we begin and end a cycle with Fig. 3. At the stage shown by Fig. 3, we have "a mass of glass ready for discharge into a mold" (page 3, lines 64, 65), and all that remains is its severance. At this point, suction begins in the tube to narrow the gob for shearing, shown by Fig. 4. This suction continues during and after shearing until the stub is drawn up into the tube, shown by Fig. 5. During this suction, the column of glass (to be used for stuffing the next gob) is being built up also from the gravity flow. When this suction deflection of the gravity flow ceases, the cycle of forming a new gob begins. At this point, the gravity flow from the reservoir (up to that time deflected into the tube) and that from the tubular column take control, and the lower portion of the gob is formed as shown by Fig. 1. This is continued until the gob "elongates, and thereby tends to become attenuated or thin" (p. 3, lines 55, 56). At this point, pressure is applied to the column with the results of maintaining the diameter of the charge and (it is claimed) of slightly pointing it (shown by Fig. 2) and this is continued until sufficient glass for a charge is exuded and the time for starting the narrowing for shearing has arrived (shown by Fig. 3). As to this use of gravity at this stage, the figures and the specifications are convincing.

---

in his thought and impossible by his means. His use of pneumatic force was for purposes and under conditions entirely different from that of suspended gob feeding. He describes several modes of operation, but only one uses the three pressures and then in the sequence of gravity-suction-compression. It is impossible to accomplish his purposes by the sequence of gravity-compression-suction. The use of

all three pressures is not new. Any range of novelty lies within the order, purpose, duration, and extent of use to accomplish beneficial results. It is within this range that Peiler claims the order of atmosphere-compression-vacuum for appreciable effective durations of each for designated shaping purposes and to the extent needed for such purposes. This Howard patent is **not** anticipatory thereof.

FIG. 1 FIG. 2 FIG. 3

FIG. 4 FIG. 5

FIG 10

FIG. 6 FIG. 9

FIG. 7 FIG. 8

As to the figures, the progressive differences in shape of the gob end are significant. These are: Slightly concave at the stub retraction stage, shown in Fig. 5 (just preceding beginning of a gob and caused by suction in the tube); round during the early issuance of the gob, shown in Fig. 1 (this being the natural gravity form [page 1, lines 96–105]) and caused by gravity; somewhat pointed during the formation stage by compression and until severance, shown in Figs. 2, 3, and 4. The specifications are equally

significant. The description of the operation of the method is as follows:

"In using this apparatus, the glass flowing down through the orifice first assumes the more or less globular shape 6 shown in Fig. 1. At the same time that this initial flow takes place, a certain amount of glass may be drawn up into the tube 3 [obviously, also, contemplating that it may not], then as the flow continues out through the orifice 2 and when the globule 6 elongates, and thereby tends to become attenuated or thin, the glass in the tube 3 may be forced out [compression may be used] as shown in Fig. 2 to fill in the center of the globule and cause the globule to assume substantially the form shown at 7, Fig. 2. Continued expulsion of the glass from the pipe 3, as illustrated in Fig. 3, causes the globule to maintain substantially a uniform diameter, as shown at 8, Fig. 3, so that we then have a mass of glass ready for discharge into a mold, or the like, which is of substantially uniform diameter and practically predetermined shape, and mass [p. 3, lines 48–68].

"When now it is desired to cut off this globule to leave the same in the mold, the sucking action into the tube 3 may be resumed, as shown in Fig. 4, and may be made sufficiently rapid to cause a decided contraction in the globule at the point 9 [p. 3, lines 69–74]. * * * The glass globule is then cut off at the point 9 in the ordinary manner [p. 3, lines 81–83]. * * * It is obvious that the sucking action of the tube 3 draws upon the glass after it has flowed down past the lower end of said tube, and any of the glass which lies below the lower end of this tube tends to be sucked up into the tube under the action of the vacuum. This action, therefore, is illustrated in Fig. 5 in which it is seen that the lower end of the globule which follows the one cut off tends to be drawn up into the tube, and therefore the chilled portion 11 of the following globule which was that part which contacted with the shears when the first globule was cut off is drawn up into the tube 3" (page 3, lines 87–102).

From the above, as to figures and specifications, it is clear that Howard's necessary sequence in forming and shaping a gob charge is: Gravity or normal pressure to start the gob and that this pressure continues until the charge "elongates, and thereby tends to become attenuated or thin"; compression to shape and maintain the uniform shape, and this pressure continues until the entire charge is extruded and the time for severance at hand; suction to narrow the charge for shearing, to retract the stub for reheating, and (at

the same time) to build up, in the tube, the column to be used in shaping the next charge, and this pressure is continued until the next charge starts forming. This sequence—in order of pressures and definite duration of each—is precisely that of these two Peiler claims. The purposes of each pressure are the same in both patents, with Howard using suction for an additional purpose; that is, to build up the glass column in the tube.

The Howard application, serial No. 180,-795, was filed slightly less than a year after the application for the above patent and before issuance of such patent. As filed, it was purely an apparatus application. Obviously, it was intended to furnish the complete apparatus to effectuate the method outlined in the above patent. Figures 3, 5, 6, 7, 9-13, are identical with the figures (differently numbered) in the above patent. The operation, quoted above, from the specifications of the patent, is repeated with scarcely a change in wording as the operation of this apparatus. Obviously, the importance here of this application lies in the machinery which compels or permits a gravity forming period. To get the full force of meaning of the effect of this machinery, it is useful to recall a prime feature of the method patent which has a vital bearing. A prime purpose of the patent method was to overcome the checking of the gravity flow by mechanical plunger action which resulted "even in some cases reversing it in the orifice tends to cause clogging" (patent, page 2, lines 27-29): This is repeated in the application (transcript, page 620, lines 1, 2). The method of doing this was a vital feature of the patent method and of the application apparatus. This was the "doughnut" flow formed by the orifice and tube. The effect of this character of flow was to remove the glass in the forehearth from all range of checking or retarding influence so that operation under the method or by the apparatus would leave the gravity flow from the forehearth into the orifice at all times unimpeded (patent, page 2, lines 47-60, 91-96, 106-130, page 3, lines 1-47, 102-105, page 4, lines 11-16, 90-108; these statements are repeated in the application). The suction force in the tube is exercised "at or beyond the orifice" (patent, page 2, line 52; application transcript, page 620, line 18). When these things are kept in mind and Figs. 5 and 6 of the patent and 3, 4, and 13 of the application (all showing the extreme effect of suction upon the flow at the lower outlet) are examined, it is clear that lessening of suction (thus reducing the effect of deflection of gravity flow into the tube) will, progressive-

ly, increase the effect of gravity in formation of the initial or lower section of the gob. Therefore the rate of action of the apparatus in passing from suction to compression has a determining influence upon the effect of gravity at this period in forming the beginning of the gob. Having this in mind, we examine the apparatus. The application of either suction or compression in the tube is primarily determined by two cams (70 and 74 in Fig. 1)—one of which (70) controls suction and the other (74) compression. On the periphery of each cam is a spring-contacted roller at the lower end of a rod, the upper end being movably attached to a short lever, the other end of the lever being attached to a valve. One of such units operates the suction valve (connected with suction supply) and the other the compression valve (connected with compression supply). Both cams are on a shaft which revolves them clockwise. From this arrangement it is clear that the time of operation, the character (amount) of force, and the period of duration of either suction or compression depend upon the form of the cam peripheries, the relative size (as to each other) thereof, and their relative position (as to each other on the shaft). The cams in position on the shaft are shown in Fig. 1 and (as a detail) Fig. 2. They are exactly the same in size and shape, and are placed directly opposite on the shaft. Fig. 1 shows the entire apparatus at the beginning of the full strength suction stage when the stub is being drawn upward. From this and the positions of the cams, it is clear that the valves open on the greatest and close on the least diameters of the cams. Therefrom results the controlling importance of the differences in such diameters, that is, the shape of the cam. This shape and operation cannot be understood without reproducing Fig. 2, which is as follows (direction of rotation indicated by the arrow and the apparatus being in the position shown in Fig. 1 and above described):

In the drawing 48 is the shaft, 70 the suction control cam, 74 the compression control cam, 69 the suction rod roller, 72 the suction

roller contact spring, 71 the guide-sleeve for rod 68 and the upper spring contact, 68 the rod connecting at its upper end with the suction valve lever (similar connections for compression are not shown).

The first thing to be noticed is the period of sustained diameters occurring at the greatest and at the least diameters. Obviously, the purpose and effect of these are to furnish a sustained full application of one force while during the same time the opposing force is held inactive. The second thing is the difference in shapes of the two sections of the cam between these extreme diameters (greatest and least). That section active when a valve is passing from closed to full application is a straight line. The section active when a valve is passing from full application to closed is concave and shorter. Clearly, the purpose and effect of the straight line are a direct, progressive building of power from zero to maximum; while those of the concave line are a more rapid and abrupt loss of power from maximum to zero.

Our immediate concern is with the effect upon gravity on the gob issuance during the period when the straight line of the compression cam and the concave line of the suction cam are active. At the time this activity commences the bottom of the gob is held in suspense just below the orifice outlet (application Fig. 4) by the maximum suction (which has been active since narrowing the gob for shearing), which is deflecting the gravity flow (out of the forehearth) from extending the gob into the tube; also, this deflected gravity flow is constantly pouring with full gravity force (possibly with some accentuation [application, transcript, page 622, lines 12–21, page 625, lines 5–8]) into the orifice to the place of issuance from the outlet. Abruptly, and in appreciably less time than the compression can be built up (over the longer straight cam sector), suction terminates, resulting in gravity taking control and flowing the earlier part of the gob from the outlet.

From what has been said concerning the method of Howard, No. 1,315,668, and the operation and effects of the apparatus of Howard application serial No. 180,795, it is evident that each and both of these anticipate these two Peiler claims. In fact, the Howard application has not only the sequence of suction-gravity-compression but it has the sequence suction-gravity-compression-gravity, the gravity after compression becoming active through the longer straight building up sector of the suction cam in coaction with the shorter concave sector of the compression cam. Thus the application would anticipate all of the Peiler method claims even if they were otherwise valid and not limited, as to usefulness, to the above suction-gravity-compression sequence.

### (C) Apparatus Claims.

The apparatus claims involved are 1, 2, 3, and 4 of Peiler, No. 1,405,936, and 2, 4, 14, 21, 31, and 33 of Peiler, No. 1,662,436. They are set forth in the footnote.[8] Claims 31 and 33 were found to be invalid. All of the

---

[8] The claims of No. 1,405,936 are as follows:

"1. In an apparatus for separating molten glass into mold charges, the combination of a glass container having a submerged outlet, an air pump, a conduit to transmit air pressure from the pump to the surface of the glass, means for actuating the pump, and means operative in timed relation with the pump for relieving the pressure formed thereby.

"2. In an apparatus for separating molten glass into mold charges, the combination of a glass container having a submerged outlet, an air pump, a conduit to transmit air pressure from the pump to the surface of the glass, a valve to open the conduit to the atmosphere, means to actuate the pump and means to actuate the valve.

"3. In an apparatus for separating molten glass into mold charges, the combination of a glass container having a submerged outlet, an air pump, a conduit to transmit air pressure from the pump to the surface of the glass, a plurality of valves to open the conduit to the atmosphere, means to actuate the pump and means for successively actuating the valves in timed relation with the actuation of the pump.

"4. In an apparatus for separating molten glass into mold charges, the combination of a glass container having a submerged outlet, an air pump, a conduit to transmit air pressure from the pump to the surface of the glass, means for actuating the pump to produce alternate compression and vacuum, valves to open the conduit to the atmosphere and means for actuating a valve in timed relation with each pressure."

The claims of No. 1,662,436 are as follows:

"2. The combination of a molten glass container having a submerged outlet, and means to periodically apply pneumatic pressure above atmospheric pressure on the glass in the container, to reduce said pressure below atmospheric pressure and to return the pressure to normal atmospheric pressure, during substantial periods of time in each cycle of operations of said means, whereby the glass issues from

claims were limited. That we may understand the issues as to these claims it seems well to summarize the contentions of the parties here and then to dispose thereof in as orderly manner as may be.

### Contentions of the Parties and Issues.

*Appellant.* Both patents disclose, and each of the claims in suit claims, a novel combination of elements constituting an apparatus for applying three distinct and substantial glass-controlling pressures to the glass over a submerged orifice to shape to the mold and properly share suspended gob charges. The broad conception covered novel combinations of generic character. The two applications were filed on the same date; the first numbered application (resulting in patent No. 1,662,436) contained the generic claims to cover the broad conception. These claims read upon the second application (resulting in patent No. 1,405,936); such application being limited to combinations containing specific elements which do not appear in, and could not have been claimed in, the generic application.

The errors of the trial court were (1) in limiting all of the claims "to the specific valve mechanisms and their operating devices shown in the drawings and set forth in the descriptive portions of the specifications"; and (2) in holding claims 31 and 33 invalid either as being broader than the patent disclosure or as anticipated by McCauley.

The limitation is erroneous because (a) there is "nothing in the language of the claims, the specifications of the patents, or in the prior art, that justified * * * reading into any of these claims the details of the valve mechanism shown and described in the specifications" merely as disclosures of the preferred form of mechanism and which is not incorporated in these claims but others of the same patent; (b) the ordinary presumption of novelty and validity arising from the grant of a patent is here strengthened by the fact that the Patent Office had before it the citations relied upon by the trial court and by appellees, and yet did not require the incorporation in these generic claims of these details of structure, although such are specifically recited in specific claims (not here involved) of the same patent.

The invalidating of claims 31 and 33 is erroneous because (a) the claims are not

the container under normal atmospheric pressure for a definite period and under super atmospheric pressure for a definite period, and whereby the issue of glass is retarded during the definite period of reduced pressure.

\* \* \* \* \* \* \*

"4. The combination with apparatus for separating molten glass into mold charges of a glass container having a submerged outlet, automatic means for periodically applying, in succession and for maintaining for substantial periods of time more than two different air pressures to the surface of the glass to control its discharge through the outlet, and adjustable means for determining the rapidity with which the air pressure is changed while maintaining constant periodicity of pressure applications.

\* \* \* \* \* \* \* \*

"14. Apparatus for segregating molten glass into freely suspended gathers of desired shape, including in combination a glass container having a discharge outlet, periodically operated means for applying different pneumatic pressures to the glass in the container for controlling the discharge of glass from the outlet, and for retracting part of the discharged glass into the outlet in regular cycles, means for adjusting said controlling means to vary the speed and the duration of the discharge and retraction, while maintaining the frequency of operation of the controlling means constant.

\* \* \* \* \* \* \* \*

"21. The combination with a molten glass container having an outlet, of automatic means for periodically applying three different pneumatic pressures each of definite and substantial duration to a surface of the glass near the outlet during each cycle of operations of said automatic means to regulate the movement of glass in the outlet. .

\* \* \* \* \* \* \* \*

"31. The combination of a receptacle to contain molten glass, said receptacle having an opening, a tubular valve extending downward into the glass above said opening and having a normal stationary open position above said opening, means to cause a periodic discharge of glass from said opening while the valve is in said position, and means to move said valve downward and cut off the supply of glass to said opening.

\* \* \* \* \* \* \* \*

"33. The combination of a receptacle to contain molten glass, said receptacle having an opening in the bottom thereof, a cylinder open at its lower end projecting downward beneath the surface of the glass over said opening, automatic means to vary the pressure within the cylinder, said cylinder having a normally fixed position permitting the passage of the surrounding glass to said opening, and means whereby the cylinder may be adjusted into position to cut off communication between said opening and the glass surrounding the cylinder."

broader than the disclosures; and (b) neither the McCauley patents nor any other citation contains all of the elements involved in these two claims, and anticipation of a combination patent exists only where a citation contains all of the elements of the combination, or their mechanical equivalents, and they do the same work in substantially the same way; that is, anticipation cannot be constructed by finding the various elements of the combination scattered through several citations.

*Appellees.* Peiler, No. 1,662,436, is invalid for "double patenting" because (a) it is for the same invention disclosed in Peiler, No. 1,405,936; (b) Peiler, No. 1,405,936, issued without reservation of subject-matter disclosed but not claimed or any notice of reservation; (c) the term of monopoly would be extended six years, since the apparatus and method claims of No. 1,662,436 (if construed as appellant contends) would cover the identical apparatus of No. 1,405,936 (issued six years earlier).

Claims 31 and 36 of Peiler, No. 1,662,436, for specific apparatus, are invalid because (a) anticipated by the prior art; (b) broader than the disclosure; and (c) containing no description of the element and its mode of operation upon which reliance is placed for establishing identity with appellees' apparatus.

*All* claims should be limited because (a) of nonuser and nonusability commercially; (b) mere improvements in a crowded art; (c) disclaimers in the patents; (d) the claims are expressed in functional language which must be interpreted and limited by the specifications; and (e) of disclaimers and limitations in the Patent Office history.

The limitation of No. 1,405,936 is "to the specific valve mechanisms in which the valves are connected into the conduit from the pump to the bell * * * and which are optionally controlled by adjusting devices to operate in timed relation with the pump." The limitation of No. 1,662,436 is to "the specific valves and valve operating mechanisms as disclosed in the specifications."

*The Issues.* From the above contentions of the parties arise the issues here as to these apparatus claims. Some of these issues have to do with validity and some with limitation of the claims. The issues as to validity concern Peiler, No. 1,662,436, and also particularly claims 31 and 33. The issue as to the entire patent is that of double patenting, involving Peiler, No. 1,405,936. The issues as to claims 31 and 33 are whether they are broader than the disclosures; whether they lack necessary completeness of disclosure; and whether anticipated by the prior art. The issues as to limitation of the claims are whether they should be limited because of the language of the patents (including therein the following: limiting disclaimers in recognition of the art, functional expression of claims thus requiring interpretation and limitation by the specifications and the use of specific apparatus solely as disclosures of preferred forms); the history in the Patent Office; the prior art; and the alleged "paper patent" status because of nonuse and nonusability commercially.

While not an issue, the appellant urges that the presumption of novelty arising from issuance of a patent is specially potent here because these patents issued after contests in the Patent Office in which the Office had before it the same citations here relied upon by the trial court and the appellees. It seems best to examine this matter and then take up the issues above stated.

## Patent Presumption.

Presumptions having force in judicial proceedings have been classified as presumptions of law, presumptions of fact, and presumptions of mixed law and fact—the first based on public policy and the second upon a recognized natural sequence of cause and effect between certain facts or sets of facts. However, we need not here worry about classifications, because the presumption that a patent is valid (as to novelty) arising from its grant may well be placed in any of the classes as it rests on both of the above bases.

The basic reason for patents is the benefit to the public through discoveries, in the arts and sciences, of methods, means, and results useful to it. To be "discoveries," they must be unknown before—"novel." To encourage and stimulate exploratory effort, the public (for its own benefit) offers and gives a right to the prize of a protected monopoly of such useful discoveries for a limited term of years. The machinery to work out this plan is administrative with final resort to the courts. To the Patent Office is primarily given the duties of determining such novelty and usefulness and, if found to exist, of issuing the grant of monopoly in the form and terms of a patent. Unless such novelty and usefulness exist, no grant can properly issue. The Patent Office is clothed with ample powers to make its investigation thorough; its facilities for so doing are exceptional and its personal impartial public officials are supposedly expert and experienced therefor. Such investigation involves the rights of the

applicant and of the public. It is of serious concern to both—not only generally because it involves important rights, but also because it has certain resulting practical consequences to the inventor and to such of the public as are or may thereafter be directly concerned therein. Some of these results are purposed and expected by the grant; i. e., the expenditure of effort and means by the inventor and others to make the patent actually useful to the public. Such expenditure is usually and is properly induced by reliance upon this administrative determination of validity which is necessarily declared by the very grant itself. Obviously, public policy demands that such official determination, upon which people have acted to their cost, carry weight wherever it is brought in question.

Added to this is the natural sequence of cause and effect resulting from a determination of a matter by experts clothed with full powers and possessing special facilities for investigation.

The result of this situation is to give force thereto through a presumption of validity whenever the novelty of a patent is attacked in court. Impressive under all ordinary circumstances, we think this presumption is emphasized where it is made to appear that the determination of validity in the Patent Office was after contest involving the very citations presented later in court. In such situation, the chance of hasty, ill-considered, or uninformed action by the Patent Office disappears, and the issue there is upon the same matters as in the court. In what way can this presumption be given practical effect in a court? Since it is rebuttable and may be overthrown by proof, clearly only in two ways: To control the duty and the amount of proof. As to the duty of proof, the presumption is given full effect by treating the patent as prima facie valid and placing upon those who would overthrow it the duty of presenting proof to that effect. As to amount of proof, the situation is, from its very nature, less definite because it is one of degree in the mental attitude of the trier of the fact. No rebuttable presumption can override a fact which the trier believes established by the evidence. The province of a rebuttable presumption is to resolve doubt as to the ultimate fact where the evidence is not convincing either way. The intensity of such a presumption may vary and is, possibly, best expressed as a rule or principle of judicial thought if it is to be of any practical use. Thus expressed, and because of the nature and consequences surrounding patents as

above indicated, we think this presumption should prevail to resolve all reasonable doubts in favor of validity of the patent or, otherwise expressed, the patent should be upheld unless the trier is convinced from the evidence that it is invalid. With the above function of this presumption in mind, we will examine and determine the attacks on the novelty of these claims which resulted, in the trial court, in the invalidity of some and the limitation of others.

### Issues and Order of Examination.

As stated above, the issues as to these apparatus claims involve both validity and scope. The issues as to validity concern patent No. 1,662,436. The entire patent is attacked as subject to the charge of "double patenting" with the other earlier issued patent No. 1,405,936. Claims 31 and 33 are attacked on other particular grounds. The scope of the two patents is sought to be limited by appellees and to be established as generic by appellant on the grounds above set forth in summarizing the contentions of the parties. We shall examine these issues in the order following: Validity of Peiler, No. 1,662,436; validity of claims 31 and 33 of the same patent; scope to be given the claims here involved of both patents.

### Validity of Peiler, No. 1,662,436.

The attack upon the validity of this patent, as an entirety, is that it is double patenting on Peiler, No. 1,405,936. Separate applications for these two patents were filed on July 17, 1920. They took successive serial numbers; the application for the later patent being 396,934, and for the earlier patent being 396,935. As originally filed, both patents were purely for apparatus. Without reference or any difficulty in the Patent Office, the second application passed for issue on July 16, 1921, and, after two formal amendments thereafter suggested by applicant, the patent issued February 7, 1922. The earliest action of the Patent Office on the first application was on July 15, 1921 (the day before the second application was passed for issue), when four of the nineteen claims were rejected on references. These references were answered by an amendment dated July 13, 1922, wherein the references were sought to be met by amendment or argument, the specifications were amended in one respect, and nine new claims added. Included in the new claims were four method claims. These four method claims, after changes to meet rejections, passed into patent claims 24–27 (discussed earlier in this opinion). As

to the new amendments, the applicant stated as follows: "Several new claims have been added for the purpose, in part, of preventing an infringer from avoiding the claims by the use of an intermediate stabilizing pressure slightly above or below normal atmospheric pressure, instead of exposing the surface of the glass directly to the open atmosphere. This feature is more particularly covered in the submitted method claims."

Subsequent proceedings in the Patent Office developed clearly the contention of applicant for the three air pressures of definite duration each. This is the general situation involved in this issue as to double patenting.

The rule of law to be applied is that only one patent can be allowed for the same invention. The "invention" is what the applicant has discovered as shown by his own disclosure thereof in the specifications and drawings of his application. He has a right to the whole of that disclosure, but can appropriate less if he desires so to do. His desires are measured by his claims. If he claims less than the entirety, he is presumed to have abandoned the balance and thereby appropriated it to the public, unless the situation rebuts this presumption of abandonment. Where several applications, the claims of which together cover the entire disclosure but do not duplicate, are co-pending in the Patent Office, the presumption of abandonment is rebutted. The Barbed Wire Patent, 143 U. S. 275, 280, 12 S. Ct. 443, 36 L. Ed. 154; Suffolk Co. v. Hayden, 3 Wall. 315, 318, 18 L. Ed. 76; Century Electric Co. v. Westinghouse Elec. & Mfg. Co., 191 F. 350, 352, this court; Anderson v. Collins, 122 F. 451, 458, this court; Ide v. Trorlicht, Duncker & Renard Carpet Co., 115 F. 137, 145, this court; Montgomery Ward & Co. v. Gibbs, 27 F.(2d) 466, 469 (C. C. A. 4) certiorari denied 278 U. S. 630, 49 S. Ct. 29, 73 L. Ed. 548); Traitel Marble Co. v. Hungerford Brass & Copper Co., 22 F.(2d) 259, 260, 262 (C. C. A. 2); Thomson-Houston Elec. Co. v. Ohio Brass Co., 80 F. 712, 727, 728 (C. C. A. 6); Thomson-Houston Elec. Co. v. Elmira & H. Ry. Co., 71 F. 396, 404, 405 (C. C. A. 2) certiorari denied 163 U. S. 685, 16 S. Ct. 1201, 41 L. Ed. 315. Even where there is no abandonment, the main problem in double patenting exists. That problem is whether the differently issued patents cover matters which, in a patentable sense, are different. Miller v. Eagle Mfg. Co., 151 U. S. 186, 14 S. Ct. 310, 38 L. Ed. 121. That is the question here and depends upon a comparison of what is covered in these two Peiler patents.

Both are combination patents. The general objects and the general method of securing such are the same in both disclosures. Broadly, the objects are to shape suspended gob feeds to fit the mold and to provide means of varying the applications of the forming force (air) to conform to variations in working conditions of the glass so that a uniform feed of the desired shape may be maintained. Broadly, the method is to control the extent, duration, and rate of application of the three pressures (normal, supernormal, and subnormal), with means for readily varying such extent, duration, or rate to meet working conditions. This issue of double patenting is equally applicable to the method claims of the second patent but, as to such, is clearly not well founded. It is entirely proper to cover the same disclosure by two patents—copending—one for the method and the other for the apparatus. As to this matter of double patenting, claims covering a process or method are held to be different from claims covering apparatus, Century Elec. Co. v. Westinghouse Elec. & Mfg. Co., 191 F. 350, this court; Dayton Fan & Motor Co. v. Westinghouse Elec. & Mfg. Co., 118 F. 562, 572-575 (C. C. A. 6); or product, American Optical Co. v. Shur-On Optical Co., 16 F.(2d) 1013 (C. C. A. 2), affirming on opinion in (D. C.) 9 F.(2d) 932; or design, Bayley & Sons v. Standart Art Glass Co., 249 F. 478 (C. C. A. 2). With objects and methods alike, a comparison for differences in the two apparatuses must lie in the mechanical means of working out the method.

The delivering of a gob charge to a mold involves the proper shaping of the required amount of glass for the desired charge and the severance thereof. Both of these patents have the same devices for severing the charge and for measuring the amount of the charge and the operation thereof is the same. Differences are to be sought in the air-producing and air-control mechanism which shapes the charge.

In the first Peiler patent (No. 1,405,936), the abnormal air pressures source is a reciprocating cylinder pump built unitary with the feeding mechanism and operated from the same main drive shaft which moves some of the air-control mechanism. In the second Peiler patent there is no designation of a particular abnormal air pressure source and no mechanical device shown to produce such —the reference is simply to "a supply of compressed air," "source of compressed air or vacuum," and other like general expressions. In each, the abnormal pressures have pipe connection with the air tube of the

air bell from the pump in Peiler's first patent or the "source" in Peiler's second. The utilization of the three pressures (normal, supernormal, and subnormal) is accomplished by control of the abnormal pressures, and the mechanism therefor is, for the most part, located in the line between the source of supply and the air bell. The exception in this location is found in Peiler's first where there is a certain amount of such control in the action of the air pump. This reciprocating pump produces alternate super and sub air pressures. The specifications state that this action is "preferably with a dwell at each end of the stroke" (page 3, lines 4, 5). The result of such "dwell" is, of course, toward exhaustion of the existing abnormal pressure. The extent of such exhaustion (to normal or not) is not specified, but it is obviously possible so to shape the cam governing the pump piston and to regulate the stroke of the piston as to make this dwell sufficient to entirely exhaust the abnormal pressure and for such exhaustion to endure an appreciable period in relation to the charge cycle. However, it is clear that the control contemplated by Peiler lies in other mechanism in the air line between the pump and the bell; the real function of this dwell being rather to afford better opportunity for such control (in the air line) to be more fully effective.

It is advisable to outline this control separately as to each patent. The purposes of this control are to govern (1) the duration of the abnormal pressure, (2) the rapidity with which the abnormal pressure is succeeded by normal, (3) the rapidity with which normal pressure is succeeded by abnormal, and (4) to adjust certain of these controls during operation to conform to changes in working conditions arising during operation. The mechanism to accomplish each of these results is as follows:

As to the first patent:

(1) Duration of pressure is through the action of two automatically actuated plunger valves connected with a part in the air line. At a part in the air line is connected a pipe with a branch to each of the valves. These valves are identical in construction and operation—one relieving superpressure and the other relieving subpressure. The plunger in the valve has a passage which can be brought in line with opposite parts in the valve casing (one being the outlet of the branch pipe) to release the pressure, but, when out of alignment, the pressure is unaffected. To one end of the plunger is attached a roller travelling on an adjustable cam which is so formed as to bring the plunger in pressure release posi-

tion at the proper time in the cycle of the charge formation and to keep it out of such position at other times. The cams are attached to, and operated by, the main drive shaft.

(2) Rapidity of change from abnormal to normal pressure is secured by a throttle valve in the valve casing part opposite the branch pipe. Regulation of this throttle valve controls rapidity of escape of air to relieve superpressure and of entrance of air to relieve subpressure. Without this throttle valve, the action of the plunger valve would be almost instantaneous.

(3) The rapidity with which normal pressure is succeeded by abnormal is governed primarily by the action of the pump in its change from one stroke to another with the intervening "dwells," but this may be further affected by a modification consisting of two pipes instead of one connecting the pump cylinder to the air bell with a check valve and a throttle valve in each. The check valves are set so that superpressure passes through one and subpressure the other. The adjustable throttle valves govern the rapidity of passage of the pressure through the particular pipe.

(4) Adjustments during operation are secured through a hand wheel which raises the action of the pump and others which vary the action of the plunger valves and through adjustments of any of the above throttle valves.

From the above description of this mechanism, the summary of the operation of it is that it is primarily based on the action of the reciprocating pump with various valvular regulation in the air stream to regulate the effect of this pump action in the ways of variation and more accurate control of the duration of pressure and the rapidity of change from abnormal to normal or from normal to abnormal pressure, and that some of this variation and control may be made during operation to fit changes in working conditions arising during operation.

In the second Peiler patent there is no provision for a pump, which is important in the first patent. The principle of this machine is to have constant sources of supply of compression and suction (super and subnormal pressures). While the specifications seem to contemplate the use of two abnormal pressures (one supernormal and the other subnormal), they state: "It will be obvious that the pressure applying devices may be increased in number, so as to apply a greater variety of pressures [than one super-normal, one sub-normal and normal] if so desired" (page 2, lines 108–111). Its mechanism is designed to control automatically the applica-

tion and release of these various pressures in a desired sequence entirely through the action of valves in the air line between the source (or supply) of pressure and the air bell.

The main control is as follows: From the sleeve of the air bell air tube runs a pipe from which are three branch pipes each connecting with a valve—one valve communicating with superpressure supply, one with subpressure, and one a relief to atmosphere. These valves are plunger type of identical construction and actuation. Each valve is yieldingly held either in open or closed position by a spring-pressed detent engaging either of two notches (one open position and one closed position) in the plunger. The open position is when a transverse opening in the plunger is in alignment with the branch pipe and a port leading, respectively, to superpressure, subpressure, or atmosphere. Actuation of each valve is by two separate and relatively adjustable cams, one to open and the other to close the valve. These cams are so adjustably mounted on the main drive shaft that the time of opening or of closing any valve may be adjusted independently of the other valves. The operating connections of the plunger are a lever mounted on a frame bracket and having a slotted lower end engaging a pin on the plunger. This lever carries on opposite sides of its fulcrum two offset rolls which are in operative relation with the two cams (one opening, the other closing the valve). In order to secure adjustment of each cam independently of the other cam for the same valve and of the cams on the other valves, each cam is provided with an integral bevel gear in mesh with a bevel pinion freely rotatable on a stud formed on a collar which is loosely mounted on the drive shaft. This collar is held in adjusted position by a segmental gear integral therewith which engages a worm fixed on a separate shaft mounted in bearings projecting from the top of the table or platform which spans and supports the air bell and its immediate connections. Each of these separate worm shafts has a handwheel which can be turned to vary the timing of the particular cam. Thus the starting and also the ending of any pressure (normal or otherwise) can be changed and, therethrough, likewise the duration of any such pressure. These valves may be set to operate in any desired sequence and the starting, ending, and duration of any pressure independently controlled.

A further control is secured by throttle valves in the branch pipe lines. This control is as to the rapidity of change from one pressure to another. This control is exerted through regulation of the size of orifice in the throttle valve. To make more effective this feature of the device in so far as return to normal from abnormal pressure is concerned, the branch pipe to atmosphere is branched at its outer end. Each of these branches has a throttle valve near the branching point with a check valve beyond it on the branch. These check valves are set so that the air must pass in one direction only—thus one controls relief from supernormal and the other from subnormal pressure.

A further control of rapidity of change from abnormal to normal pressure may be secured through a pipe inserted in the air line between the bell and all of the above valves. In this pipe are inserted a check valve and a throttle valve, the former being nearest the branching place, the check valve being set to close on one abnormal pressure and to open instantly on the opposite abnormal pressure. It is obvious that but one such arrangement could be operable at the same time. While it is not distinctly stated, this feature is intended to apply both to superpressure and subpressure (page 4, lines 64, 65), and this could be done by two independent units of this character with oppositely set check valves, one unit controlling relief from vacuum and the other from compression. Either could be made inactive through closing the throttle valve when it was desired to use the other.

This machine seems capable of justifying the statement in the specifications (page 5, lines 52–67): "That the time of starting, the time of stopping, the application of a new pressure and the rate at which any change in pressure is made, are all independently adjustable during the operating of the machine. By this construction it is possible to adjust the feeding machine so as to produce various shaped mold charges adapted to use in as many different shapes of molds. Moreover, by manipulation of the various adjusting devices during the operation of the machine, the shape and size of the charges may be kept uniform notwithstanding the slight changes in heat or other operating conditions, which usually produce slight variation in the charge."

The purpose of setting out the construction and operation of these two Peiler patents is, of course, for comparison to determine whether the second patented machine is, in a patentable sense, the same as the first, and therefore the second patent void for double patenting. Such comparison reveals differences which reveal the two machines as essentially unlike. The purpose of each was

the same—to shape the suspended gob through control of air pressures affecting that shape. Quite a few of the mechanical features (such as the air bell and its manipulation and the shares and their operation and regulation) are identical, but there are marked differences in the two methods of air control. It seems unnecessary to point out all of these. One example is the unitary air pump in the first patent which is a basic feature in the air control of the first patent but which is entirely absent from and unnecessary in the second patent. Broadly speaking, the second patent is capable of more accurate controls and easier regulation of changes in control than the first patent. Also, this difference in capacity is not merely an improvement in the nicety of control but is reached through a different system of controls. There is no double patenting.

### Validity of Claims 31 and 33.

Appellees contend these two apparatus claims of the second patent are invalid because (1) broader than the disclosure; (2) an incomplete disclosure; and (3) anticipated by the prior art. The trial court determined invalidity for the two reasons of broader than the disclosure and of anticipation by McCauley, No. 1,281,083 and No. 114,583 (British). The claims are as follows:

"31. The combination of a receptacle to contain molten glass, said receptacle having an opening, a tubular valve extending downward into the glass above said opening and having a normal stationary open position above said opening, means to cause a periodic discharge of glass from said opening while the valve is in said position, and means to move said valve downward and cut off the supply of glass to said opening. * * *

"33. The combination of a receptacle to contain molten glass, said receptacle having an opening in the bottom thereof, a cylinder open at its lower end projecting downward beneath the surface of the glass over said opening, automatic means to vary the pressure within the cylinder, said cylinder having a normally fixed position permitting the passage of the surrounding glass to said opening, and means whereby the cylinder may be adjusted into position to cut off communication between said opening and the glass surrounding the cylinder."

It is clear that the distinguishing feature aimed at in both of these claims is the adjustability of the air bell so as to stop flow of glass to the orifice outlet. They contemplate an air bell so mounted that it is a control for the glass passing from the fore-

hearth to and through the outlet orifice during normal operation of the feeder but which can be raised or lowered to vary such control and can be lowered to completely shut off the flow from the forehearth when the feeder is started.

We are not impressed by appellees' contention that each of these claims is so incomplete in statement as to render them invalid. The contentions of too broad a claim and anticipation are more serious. We think the contention that the claims are broader than the disclosure not well founded. The specifications (page 2, lines 24–59, and page 4, lines 90–102) clearly contemplate and provide mechanism for vertically adjusting the air bell. It is true that there is no statement that the adjustment downward may be such as to shut off the flow from the forehearth. But there is no statement to the contrary, and the utility of such adjustment and the ease of making it with this apparatus are so evident to any one familiar with the art that it is a self-evident matter. In fact, these claims were suggested in the Patent Office and came in by amendment supported by supplemental oath.

Appellees contend, and the trial court found, anticipation of these claims. The trial court based anticipation upon the two McCauley patents, No. 1,281,083 and (British) No. 114,583. Appellees urge here not only these McCauley patents but also Rau, No. 1,151,393, and Wilzin (French), No. 439,-150. The McCauley patents are quite similar to each other in this respect—the drawings are identical, but there are some differences in the specifications. A prominent feature in these patents is a nozzle which forms the outlet and projects upward from the floor of and into the forehearth. The upper or projecting portion is tapered inward on the outer side. The prime purpose of this tapering is to permit control of the quantity of glass drawn into the nozzle for a charge. This control arises through lowering the air bell— the further it is lowered the more restricted the space between the bell and the nozzle through which the glass must pass from the forehearth. It is emphasized that, in normal operation, the glass level in the forehearth is below the upper lip of the nozzle. The feed is accomplished through sucking up the glass (between the lower end of the bell and the upper end of the nozzle) into the bell where it will then flow down through the nozzle outlet. An emphasized feature is that, when the machine is suddenly stopped, only a small quantity of glass will flow out because the nozzle top projects above the forehearth

glass level (page 2, lines 77–89). Thus it is not at all necessary in order to prevent outflow of glass to do anything else. However, the specification discloses (page 1, lines 70–75): "The nozzle 16 is removably held in place by clamping members 17 and is arranged with a tapering upper end 18 whereby when the tubular feed member 19 is lowered for its full extent no glass will flow into the nozzle 16."

Applying this language to Fig. 1, it is clear that it means lowering the bell until it contacts the projecting nozzle top. It can have no other meaning. This is also and more fully expressed in the British patent. In the American patent, one of the objects is stated to be (page 1, lines 16–19): "To provide an improved construction which will prevent the discharge of the glass except when the device is positively operated."

This might refer to the nozzle raised above the glass level, to the lowered bell, or to both. This matter is clarified in the British patent by a more ample statement of objects, as follows:

"For controlling the feed to the moulds, and for preventing the outflow except in very small quantity when the operation of the machine ceases.

"Another object of the invention is to provide an improved construction which will prevent the discharge of the glass except when the device is positively operated."

Also that patent reads (page 2, lines 18–23) as follows: "The tubular feed member 19 is slidingly fitted in the upper part of the extension 2 as shown in Fig. 1, and it is normally held substantially in the position shown in Fig. 1, though the same may be raised or lowered according to the different circumstances, and as different quantities of glass are required, when the cylinder or tubular feed member 19 is lowered for its full extent no glass will flow into the nozzle 16."

We think this feature anticipated by the McCauley patents. Each of these claims reads accurately on McCauley both as to this prime feature and as to the entire wording of the claims. They are invalid because of this anticipation. Therefore we do not examine appellees' contention that Rau and Wilzin are, also, anticipations.

### Scope of Apparatus Claims.

Appellant contends that the second Peiler patent is generic, and the machine described therein is merely one form of applying the generic principle disclosed. Also that the first patent is for another machine revealing a second form. The generic principle intended is the use of three air pressures (supernormal, subnormal, and normal) each for a duration sufficient to influence the shape of a suspended gob mold charge. This is, in essence, contention for the *method*, and has been determined above in the discussion of the "Method Claims" of the second patent. However, even though appellant cannot lay claim to exclusive occupancy of the entire field of such three pressure use, yet the mechanism by which Peiler has made this method of practical utility may be entitled to a rather broad range of equivalents. Whether this is true is the matter we now examine.

Naturally, appellant contends for a wide range while appellees seek the greatest confinement thereof. The position of appellees is that the first patent should be limited "to the specific valve mechanisms in which the valves are connected into the conduit from the pump to the bell * * * and which are optionally controlled by adjusting devices to operate in timed relation with the pump"; and that the second patent should be limited to "the specific valves and valve operating mechanisms as disclosed in the specifications." The reasons urged for such limitations are: (1) nonuser and nonusability commercially; (2) claims are expressed in functional language which must be interpreted and limited by the specifications; (3) disclaimers in the patents and in the Patent Office; and (4) mere improvements in a crowded art.

We dismiss the contentions as to (2) (the form of expression of the claims) and as to (3), the disclaimers, since an examination of the record furnishes no basis therefor.

■■■ (1) *Nonuser.* The record is clear that no machine made under either of these patents has ever gone into commercial use. The evidence shows that appellant is the largest manufacturer of glass-producing machinery in the country and is the owner of a great number of patents pertaining to this art—Peiler has been granted over two hundred patents relating to glass feeds. Because of the numerous patents covering many different devices in the same art, appellant has had a wide choice as to which it would manufacture for use in the industry—in fact, a choice has been a rather obvious necessity. In making this choice, the moving reasons were practical, such as character of the article to be made, simplicity of operation, cost of machine, and other considerations. The business policy of appellant seems to be to manufacture certain types of machines (un-

der some of its patents) deemed by it, for business and practical reasons, best suited to the industry. As to machinery for feeding glass to blowing molds to make bottles, jars, and similar articles, it has rather centered its efforts on mechanical rather than pneumatic feeds. Appellant determined that the mechanical feeders using a plunger, a plunger and paddle, or a needle plunger were sufficient and best suited to ordinary situations and placed those on the market. Within usual limits, such feeders would do all that was necessary and avoid the complications of a more intricate machine such as covered by these two patents. The experience of appellee company is illustrative of this line of practical effort. Appellee company used a mechanical feeder until driven therefrom by litigation when it turned, of necessity, to the pneumatic feed. The real place of feeds like those of these two Peiler patents is where the article being made requires a refinement and particularity in gob shaping not necessary ordinarily. These patented devices afford such particularity of control. There are clearly substantial reasons—in no way affecting the utility of these two devices—which have governed their introduction into commercial use.

The statute defining patentable inventions (USCA title 35, § 31) requires that they be "useful." Measuregraph Co. v. Grand-Rapids Show Case Co., 29 F.(2d) 263, 275, this court. Nonuser is sometimes an important consideration in determining the usefulness of an invention, for there is a natural presumption that an inventor would make practical use of a device which had utility. But there may be other good reasons having no connection with utility which determine whether a patented device is placed into commercial usage, and, where such reasons are present, the force of this presumption weakens and may disappear. Mere nonuser cannot affect the rights of the patentee where the device is useful. Fox Film Corp. v. Doyal, 286 U. S. 123, 127, 52 S. Ct. 546, 76 L. Ed. 1010; Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 405, 422-430, 28 S. Ct. 748, 52 L. Ed. 1122. In this record, there is abundant showing of reasons for not using the devices of these two patents. Those reasons have no bearing upon the usefulness or utility of the devices, and nonuser, therefore, has no force against such utility. Utility here depends upon whether the devices will operate. We think the evidence sufficient that they will.

■ (4) *Improvement in crowded art.* To understand just what Peiler added to the art, it is first important to recall the exact art with which we are dealing. In our discussion above of "The Art" and of "The Method Claims," we have stated that the *broad* art involved is the feeding of molten glass for making various glass articles; that the kind of article and the way of making it determine the kind of feed needed because they give rise to the requirements and problems as to the feed; that the kind of article here involved is such as bottles or jars which are made by blowing in molds; that the requirements and problems of such mold feeding are accuracy of amount, shaping to the parison mold, and rapidity of delivery; that attempts to meet such requirements and to solve such problems have resulted in endeavors along various principles distinctly differing and each with difficulties and problems peculiar to itself; that one such principle is the suspended gob feed from a submerged orifice; that such feed, in so far as shaping the charge, must employ force effective upon the gob while issuing and in suspension; and that this force may be mechanical, pneumatic, or a combination of the two; the result being that the broad art of glass feeding is, because of these diversities in requirements and problems, branched into various subsidiary or lesser arts which are fairly distinct. The particular art here involved is the pneumatically controlled suspended gob feed which has its own peculiar requirements and problems. We are little concerned with how vacant or crowded may be the art of feeding for articles other than those blown in molds and, only somewhat more, even in feeding for blowing molds where the controlling force is purely mechanical. The only thing Peiler sought to affect was the pneumatic control of suspended gobs, and there is little in the glass-feeding art outside of such pneumatic control that can affect Peiler's results. What, then, was the state of this particular art when Peiler entered with these patents?

That art revealed knowledge that the shape of such a gob charge could be advantageously affected by the application of pneumatic force at or near the orifice upon the issuing glass; that supernormal, subnormal, and normal (or nearly normal) pressures were each useful in such shaping and the time in the charge cycle and the extent of effect desired from each of the three pressures; that rate of change from one pressure to the next following was helpful at some stages; that changes in working condition of the glass must be met by changes in application of the pressures in order to maintain a uniform feed. It was clear that the engineering, or machine, problem was one of control of these air pres-

sures, so that the proper pressure in the proper amount would occur at the proper stage in the charge cycle, would endure until it had exerted the desired effect upon the charge, and would give place at the proper rate to the next pressure. Broadly, it was to control the degree and timing of the various pressures in a known cycle to produce desired effects which were known.

The use of an air bell to concentrate the air force on the glass issuing from the orifice was known. Peiler worked in the field of transmitting and controlling pressures in the bell. Control of air pressure to effect results through air force is the wide art of pneumatics. The problem here was to adapt the knowledge and devices of pneumatics to effect the desired results in glass feeding. Control of air pressures arises from two sources: The pressure generator and valvular action between the generator and the place of application. The development of the art as well as Peiler's contribution are to be sought in the generator and in the air line valve controls. A study of air controls in the Howard application, Hitchcock, No. 805,068, and reissue No. 13,929, McCauley, No. 1,281,083 (Br. 114,583) and Br. 135,454, shows a wide choice of control through either the generator or the valves in line. When Peiler came into the art, there had been such use both of generator and of line valve control that neither was open to him in a generic sense, though he might range widely in the field of either or both for his own device. However, when he determined upon his means of control through generator and line valves (as in his first patent) or through line valves alone (as in his second patent), he could claim only his choice of, arrangement, and means of operations of generator and valves (first patent) or of valves alone (second patent) and a proper range of equivalents. While the particular art (pneumatic-suspended gob feed) was not particularly crowded, yet there had been developed the general purposes and needs thereof; the general means (generator and/or line valves) of meeting such purposes and needs were known; and some particular adaptation of those means had appeared. A careful comparison of Peiler's devices with each and all of the citations against them convinces that he made a useful contribution to the art which should entitle him to a fairly liberal range of equivalents but not to that broad range accorded to or approaching a generic disclosure. What this range is, in a practical sense, can be tested only by comparison with other devices and that we have

done as to the citations. The effect is that we approach comparisons with devices subsequent to Peiler in the frame of mind that Peiler has made a substantial contribution to the art. The comparison here is with the accused device and is the matter of infringement.

### III. Infrigement.

The pressure producing (reciprocating pump) and pressure line valve controls of the first Peiler patent and the pressure line valve controls of the second patent have been described above in discussing the issue of double patenting, and need not be repeated here. With the Peiler machines is to be compared that of defendants. Defendants' machine, while identical with Stuckey, No. 1,-686,109 (Stuckey being an appellee here) in the pressure pump and pressure line, makes definite certain important mechanism relating to the pump control through the air motor (which actuates the pump) that are provided for in the Stuckey patent only in general descriptive language. Therefore it is best understood by an exhibit diagram with the explanation thereof by a witness. That diagram and evidence (in narrative form) is as follows:

"This chart is diagrammatical in the sense that those parts which I consider relatively unimportant, I have omitted, but I have shown the main elements in the control of the discharge of the glass from the forehearth. At the upper right corner will be seen the pump 12, in which the piston 20 rides up and down. That piston is connected directly with the air motor piston, which in the drawing is shown at the top of the air motor cylinder. The air motor is indicated by the numeral 13. The stop which I spoke of, which limits the movement of the air motor piston and thereby the movement of the piston 20 of the pump 12 is seen at the bottom of the air motor cylinder. Usually it occupies a position considerably higher than that, because as I said before, the usual displacement of the piston 20 of the pump is anywhere between an inch and an inch and three-quarters, mostly around an inch, and therefore, the stop against which the piston of the air motor contacts on its downward movement is raised above the position shown in the diagram. That stop is elevated or depressed by a worm, and that worm is rotated and the stop raised or lowered by means of a gear which is rotated by a hand operated lever, on which is a worm, which engages with that (G–15) gear. Coincident with the movement up and down of that stop is a carrier which carries the rod with which the air valve 18, which vents to atmosphere, engages, so that as the stop at the bottom of the motor 13 is elevated, this rod will be elevated with it, so that as the piston of the air motor comes to a stop again, this stop at the bottom of the air motor, at the same time the valve stem on the valve 18 will engage that stop rod that is adjustable. The valve 19 at the other end is operated by its engagement at the top against the upper end of the pump cylinder 12. It protrudes a little above the head of the piston 20, due to the spring indicated around the shank of this valve 19, so that, as the piston falls, the spring tends to move the upper end of that valve upward, and, therefore, when the piston again rises, the valve stem 19 engages the head of the pump chamber 12, or pump cylinder 12, just before the piston 20 reaches the upper extremity of the pump cylinder 12. That accounts for the operation of the two valves at the end of the piston stroke. As I said before, in describing the pump they must always open, one or the other, at the upper or lower, must limit the travel of the piston 20. They cannot operate before that. There is no adjustment which will enable them to open before or after the pump piston reaches its upper (G–16) or lower limit.

"I am coming to the means of control of the air motor 13. In describing the apparatus itself, I referred to the piston valves. This valve is indicated by 15. It is a cylinder valve of a very well known and old type, which moves to the right or left, that is, reciprocates in an enclosing cylinder which surrounds it. That enclosing cylinder has two outlet pipes, which are not numbered, but the one at the left leads through a regulating valve, a hand-controlled regulating valve, to the top of the air motor cylinder. The one at the right leads through a similar valve to the bottom of the air motor cylinder. It will readily be seen that when compressed air is admitted through either one pipe or the other, by means of the orifice through the intake pipe at the left end of the hollow cylinder, that if compressed air is admitted to the upper pipe, as when the piston is at the upper end of its stroke, that compressed air will force the air motor piston downward, conversely, when the air motor piston is at the bottom of the air motor cylinder, and compressed air is admitted to the right-hand pipe underneath the piston, then the piston will be moved upward, and by that means you get a reciprocating action of the (G–17) pump controlled by compressed air, and that is the way that an air motor of the reciprocating type is operated, and it has been used in that way for years and years.

"In order to cause the air to enter the top of the piston, the top of the cylinder above the piston and the bottom of the cylinder below the piston, at the right time, that is, when it is desired to operate the motor to keep pace with a number of charges of glass that you want to extrude from the feeder, the cylindrical valve which I have been talking about, 15, reaches a position proper for the admission of air to the proper end of the cylinder. In the drawing, the air inlet in the piston registers with the left hand pipe, as seen, so that the piston of the air motor will receive the compressed air above it and it will be moved downward. At the same time, the pipe at the right hand end of the valve cylinder is open to the atmosphere through a port at the top of the piston, which also is directly below the port leading to the atmosphere, so, therefore, as the piston moves down by the compressed air admitted to the top part, it pushes the air below the piston out through the lower pipe to the right hand side of the valve cylinder, where it escapes to the atmosphere. The next instant the piston or valve cylinder, rather, is moved to the left by the rocker arm 14, and it comes (G–18) to a position where the compressed air line is in direct connection through ports extending longi-

tudinally through its center, and to a lateral port with the pipe leading to the bottom of the air motor cylinder. At the same time, the upper pipe leading from the top of the air motor cylinder is connected through the same port at the top of the cylinder valve to the atmosphere, and, therefore, as the piston of the air motor is moved upward by the compressed air, which is admitted to the bottom pipe, the air that was admitted previously to the top of the piston is moved by the piston out through the same pipe that it entered, but out to the atmosphere, and in that way it is exhausted.

"It is common practice and a necessity in air motor control, that air which is compressed and is on one side of the cylinder on one stroke, must be exhausted to the atmosphere in order to get rid of it, to permit the pump to move in the opposite direction. That is axiomatic, and is a device that is very old in the art.

"I have already stated that the regulating valves which may have a check valve connected with them, or not, are adjustable. If they have check valves, then the check valve will regulate the exhaust of air, rather than the admission of air (G–19), because a check valve is a device that admits air in the one direction, but not in the other. Usually, or very often, it consists of a ball which is normally held against an opening in the pipe, and as the pressure is in the opposite direction, that ball is forced out against a spring or other appliance, and permits the escape of air in the opposite direction, but it will not change the admission of air in the other direction. That will be fixed, usually. So that it is possible, by having a check valve, to regulate the amount of the escape of air from these two ends of the cylinder, without changing the definite size of opening for the intake of the air. I have already stated, I believe, that by regulating the size of opening of those two pipes, by means of these valves, the speed of the pump can be changed, because if you admit more air and don't throttle it so much, there will be a greater compression of air and the piston will move more rapidly. That way, you can change the speed of the piston, and you can change it from, say, twenty to twenty-five reciprocations a minute to correspond to the increase in the number of gobs of glass that you want to feed from the feeder. Of course, in that case, your forming machine would speed up in the same proportion, and your shears would be set up in the same (G–20) proportion, that is, your rocker arm shaft would be rotated faster. That has been the common practice for many years, and is a well known mechanism in the art.

"I pointed out that in the defendants' machine, there is no break in the pipe connecting the top of the pump 12 with the top of the bell 22. No branches whatever, lead to any valves. In that pipe, there is no means of adjustment on that pipe whatever. The only valves connected with the system are those valves 18 and 19, which definitely open or close at the end of the stroke, and there is no means of adjusting their movement otherwise, that is, they merely operate by virtue of their engagement with the cylinder head at one end and with this rod that is adjustable at the other end."

There is little similarity between this device and that of the *second* Peiler patent. It is true that both get the same general beneficial results through control of air pressures exerted in similar cycles and with somewhat similar capabilities of variation and adjustment but the mechanical means are dissimilar. To Peiler (second patent), a pressure pump is immaterial, since his entire control is through valves of various sorts located between the sources of pressure supply and the air bell. To defendants, the pump is all-important. Without it there is no change of pressure. While the poppet valves in the piston head of the pump are in the air line, their location, operation, and regulation is entirely different from Peiler's main valves on the three branches of the pressure line. Unless Peiler has covered all pressure control where three pressures (supernormal, subnormal, and normal) are employed—and we hold above that he has not—defendants' device cannot infringe this second patent.

The *first* Peiler patent is sufficiently similar to the second patent in its valve control in the pressure line to make what has just been said concerning the second patent applicable to the first patent, but the first patent is nearer defendants' machine, in that a pressure pump is a vital feature of each. The approach stops there. The pumps are different in construction, operation, and effects. Peiler uses a pump purely to create abnormal pressures which are elsewhere controlled by valves in the pressure line. Defendants use the pump both to create and relieve abnormal pressures. Both vary the piston stroke length, but by entirely different means—defendants through mechanical adjustment by shortening the cylinder length but leaving the piston free while Peiler adjusts the stroke length of the piston leaving the cylinder undisturbed. Rapidity of pump piston stroke is secured by Peiler through change in rate of rotation of the drive shaft; defendants by rate of transmission of compression to the

air motor through adjustable valves in the air line actuating the motor. Certain features of control are more accurately and easily adjusted in defendants' device than in Peiler. (either patent)—the valves in the compression lines to the motor permit regulation of intensity of *either* abnormal pressure stroke independently of the other, which is not possible in the Peiler devices. Similarly, valves in Peiler permit control over abruptness of termination of an abnormal pressure not possible in defendants' machine. We must conclude that these and other differences in construction and operation differentiate the accused machine from both of the Peiler devices, and that therefore there is no infringement.

The decree is affirmed.

BOOTH, Circuit Judge (dissenting).

Though with grave doubt, I yet feel constrained to dissent from the able and exhaustive opinion of the majority of the court. My reasons may be stated as follows:

### The Ferngren Patent.

Claim 22 of the Ferngren patent, No. 1,-677,436, was held invalid by the trial court because it was not supported by the original disclosure nor by a supplementary oath.

The majority opinion in this court holds that such oath was not necessary. In that I concur. But the majority opinion holds the claim invalid on the sole ground that the invention disclosed was not useful. From that I dissent.

The majority opinion finds in the device disclosed by claim 22 of the Ferngren patent an infirmity not discovered by counsel nor witnesses for appellees.

The majority opinion states: " * * * There is a feature, revealed in the disclosure, which we think does establish the impracticability of this part of the apparatus. That feature is the seating of the bell upon the upwardly projecting rim of the tube. Such seating is clearly contemplated by the disclosure (see Figs. 7 and 14), and is necessary for the segregation of charge contemplated. This seating is by descent of the bell on the raised upper rim of the tube. In practical operation, this seating must be repeated rapidly as charges follow each other in a matter of seconds of time. Both the bell and the tube must be and are illustrated in the drawings as being, of refractory material to resist the intense heat of the constantly contacting molten glass. Such material necessarily must be some form of heat-resisting clay composition, and therefore rather frangible. It is in-

evitable that the frequent rapid descent of the bell upon the tube rim would readily cause chipping and breaking of either or both to the point where frequent replacements would be necessary. Replacement of either is no slight matter and would entail stoppage of the machine and drainage of the forehearth. Such a situation is not tolerable in commercial production, and the evidence is clear that no such apparatus has ever passed into construction and use. The claim, as explained by the disclosure upon which it is based, reveals an apparatus which is operable in the sense that it will actually function but which is not useful because of the above vital practical defect. * * * Lacking that usefulness required by the statute (USCA title 35, § 31), we think this claim invalid."

I am unable to agree with this reasoning or with the conclusion reached. There is a presumption of utility which attends the issuance of the patent. To overcome this presumption, proof is necessary. I find no such proof in the testimony. Indeed the testimony shows that no device embodying the disclosure of the Ferngren patent has yet been built. Nor do I find anything in the inherent nature of the device disclosed or in its operation which demonstrates lack of utility.

The argument touching this matter contained in the majority opinion seems to me to be largely made up of assumptions based one upon another: First, that during the operation of the device there is necessarily a "seating of the bell upon the upwardly projecting rim of the tube"; second, that such seating is rapid and with force; third, that the bell and the tube rim are "rather frangible"; fourth, that the seating of the bell upon the tube rim will cause breaking or chipping of the bell or tube rim to such extent that "frequent replacements would be necessary"; fifth, that "such a situation is not tolerable in commercial production." I omit discussion of this chain of assumptions in detail, but simply call attention to the fact that neither the claim (claim 22) of the patent nor the specifications require, as it seems to me, that the bell should of necessity come into contact with the tube rim.

On the contrary, the specifications expressly provide (page 1, line 105): "Operating within the reservoir and mounted slidingly through the top of the extension 4 is an air bell 14 the lower end of which may fit the inner end of the nozzle 8 for the purpose of segregating a charge 15 of the glass for every operation of the bell, or if not in fitting contact with the end of nozzle 8, to partially seg-

regate a portion of the molten glass from the surrounding mass above said discharge nozzle."

In view of this provision of the specifications, it seems to me that the argument for lack of usefulness contained in the majority opinion loses its force.

I do not find in the majority opinion any holding on the question whether the Ferngren patent was infringed by the accused device of·defendant. I therefore omit discussion of this question and simply say that, in my opinion, there was such infringement.

### The Two Peiler Patents.

Two closely related Peiler patents are also involved in the present suit: Peiler patent 1,405,936, sometimes referred to as the first patent, covers an "apparatus for feeding molten glass." Infringement of claims 1, 2, 3, and 4 is alleged; Peiler patent 1,662,436, sometimes referred to as the second patent, covers an "apparatus for and method of feeding molten glass." Infringement of apparatus claims 2, 4, 14, 21, 31, and 33, and of the method claims 24, 25, 26, 27, and 36 is alleged.

These two Peiler patents, broadly speaking, cover a process and different forms of apparatus for making use of three glass-controlling pressures (atmospheric, superatmospheric and subatmospheric), each of substantial and definite duration, for the purpose of feeding glass charges out of a submerged orifice and of shaping the charges while in suspension.

The Peiler patents are in the art of suspended charge feeding.

### The Method or Process Claims.

The majority opinion, in passing upon these various claims, holds claim 27 (for method) of patent 1,662,436 invalid as an attempt to patent a function. I cannot concur in this holding. Claim 27, which is set out in footnote 2 of the majority opinion, seems to me to state clearly and concisely the steps of the method or process to be taken in order to attain the result sought.

It is true that a patent is asked also covering a machine which it is claimed will carry out the method or process. But, of course, the asking of a patent on the instrumentality does not necessarily preclude the obtaining of a patent on the method or process.

If the claim for method or process is simply a recital of the working of the specific instrumentality also sought to be patented, no patent can be obtained on the method or process. But, if the steps of the method or process can be carried out by instrumentalities other than the specific one sought also to be patented, or even by hand, then a patent or patents may issue both for the method or process and for the specific instrumentality.

In Expanded Metal Co. v. Bradford, 214 U. S. 366, 382, 29 S. Ct. 652, 656, 53 L. Ed. 1034, the court said:

"The word 'process' is not used in the statute. The inventor of a new and useful art is distinctly entitled to the benefit of the statute as well as he who invents a machine, manufacture, or composition of matter. The word 'process' has been brought into the decisions because it is supposedly an equivalent form of expression, or included in the statutory designation of a new and useful art.

"What, then, is the statutory right to a patent for a 'process' when the term is properly considered? Curtis, in his work on the Law of Patents, says:

" 'A process may be altogether new, whether the machinery by which it is carried on be new or old. A new process may be invented or discovered, which may require the use of a newly-invented machine. In such a case, if both the process and the machine were invented by the same person, he could take separate patents for them. A new process may be carried on by the use of an old machine in a mode in which it was never used before. * * * In such a case, the patentability of the process in no degree depends upon the characteristic principle of the machine, although machinery is essential to the process, and although a particular machine may be required.' Curtis, Patents (4th Ed.) § 14, note.

"In Robinson on Patents, vol. 1, § 167, it is said:

" 'While an art cannot be practiced except by means of physical agents, through which the force is brought in contact with or is directed toward its object, the existence of the art is not dependent on any of the special instruments employed. It is a legal, practical invention in itself. Its essence remains unchanged, whatever variation takes place in its instruments, as long as the acts of which it is composed are properly performed.'

"And Walker on Patents (4th Ed.) § 3, states that valid process patents may be granted for 'operations which consist entirely of mechanical transactions, but which may be performed by hand or by any of several different mechanisms or machines.'

"It is undoubtedly true, and all the cases agree, that the mere function or effect of the

operation of a machine cannot be the subject-matter of a lawful patent. But it does not follow that a method of doing a thing, so clearly indicated that those skilled in the art can avail themselves of mechanism to carry it into operation, is not the subject-matter of a valid patent. The contrary has been declared in decisions of this court."

The principles thus announced had been foreshadowed by the opinion of the court in Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139, and these cases have been followed by the courts in numerous decisions, among them: Buffalo Forge Co. v. City of Buffalo (C. C. A.) 255 F. 83; Vapor Car Heating Co. v. Gold Car, etc., Co. (C. C. A.) 7 F.(2d) 284; Gulf Smokeless Coal Co. v. Sutton, Steele & Steele (C. C. A.) 35 F.(2d) 433; Nestle-Le Mur Co. v. Eugene, Ltd. (C. C. A.) 55 F.(2d) 854; Hartford-Empire Co. v. Nivison-Weiskopf Co. (C. C. A.) 58 F.(2d) 701.

It seems to me clear from the record in the case at bar that the steps of the method or process stated in claim 27 can be carried out, not only by the specific instrumentalities described in the two Peiler patents, but also by the specific instrumentality of defendants set out in the Stuckey patent; and I can see no impossibility in the steps of the method or process being carried out by manual operations.

In my opinion, claim 27 is not invalid as an attempt to patent a function.

Claim 36 (for method) of patent 1,662,-436 is held by the majority opinion to have been anticipated by Howard 1,315,668 and by Howard application 180,795.

I cannot concur in this holding. Neither in the specifications of Howard 1,315,668 nor in Howard application 180,795 do I find the three-pressure method described or suggested, which is described and stressed in claim 36 of Peiler 1,662,436; nor is the structure described in Howard application 180,795 designed or intended to produce atmospheric pressure in the bell or tube for a substantial period of time. Subatmospheric and superatmospheric pressure are intended to be produced within the bell or tube, and are in fact produced. It is doubtless true that in passing from superatmospheric or subatmospheric pressure, or vice versa, exact atmospheric pressure must be encountered; but this last-mentioned condition was not a part of the Howard system and was not intended so to be; and it was not produced and maintained for a definite period of time, as is the case in the Peiler method.

This production and maintenance for a period of time of atmospheric pressure within the bell or tube is an important feature of the Peiler method.

The fact, if it be a fact, that the Howard structure could be made to produce a condition of atmospheric pressure within the bell or tube, is not enough to constitute anticipation of the Peiler method. Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 S. Ct. 698, 46 L. Ed. 968; Loew Filter Co. v. German-American Filter Co. (C. C. A.) 164 F. 855; Carson Inv. Co. v. Anaconda Copper Mining Co. (C. C. A.) 26 F.(2d) 651, 658; In re Ackenbach (Cust. & Pat. App.) 45 F.(2d) 437.

### The Apparatus Claims.

The majority opinion holds claims 31 and 33 of patent 1,662,436 were anticipated by McCauley 1,281,083 and (British) 114,583.

I cannot concur in this holding for reasons similar to those set out in the discussion as to alleged anticipation by Howard of the process claims, and particularly that McCauley does not disclose the three-pressure system which Peiler uses, but instead discloses a two-pressure system.

Furthermore, there is a substantial difference between the McCauley devices and the Peiler devices in the way the flow of glass out of the feeder orifice is stopped.

McCauley makes use of a nozzle, the upper end of which is above the glass line. Peiler makes use of the air bell—lowering the same.

In McCauley the charge of glass passes out of the orifice by gravity without being shaped by compressed air or otherwise. In Peiler a shaping is accomplished by use of compressed air. There are other material differences.

### Infringement.

In the majority opinion apparatus claims 1, 2, 3, and 4 of the Peiler first patent (1,-405,936), and apparatus claims 2, 4, 14 and 21 of the Peiler second patent (1,662,436) are held valid and entitled to a "fairly liberal range of equivalents." All of these claims are, however, held not infringed by the defendants' apparatus.

With this holding of noninfringement I cannot concur. To me it seems plain that the defendants' structure infringes the apparatus claims of both Peiler patents, and also the method claims of the Peiler second patent. The defendants' apparatus is concededly an embodiment of the disclosure of the Stuckey patent 1,686,109.

Of course, the issuance of the Stuckey patent raised no presumption that the device disclosed did not infringe the Peiler patents. Freeman v. Altvater, 66 F.(2d) 506 (C. C. A. 8), and cases cited.

The majority opinion, in making comparison of the defendants' device with the disclosures of the Peiler patents, does not quote from the Stuckey specifications or claims, but, instead, makes use of the testimony of a witness who gave his views of what the Stuckey patent disclosed.

I think the method is preferable of making use of the Stuckey specifications and claims.

The question of infringement is really one of law to be determined by a comparison of the disclosures of the Peiler patents with the disclosure of the Stuckey patent.

A comparison should be made between the specifications of the Peiler patents and the specifications of the Stuckey patent; a comparison should also be made between the claims of the Peiler patents and the claims of the Stuckey patent.

When such comparisons are made, it is, I think, not open to question that in both Peiler patents and in the Stuckey patent disclosure is made that the three pressures (atmospheric, superatmospheric, and subatmospheric) are all employed upon the area of glass within the air bell; also that in the Peiler feeders and in defendants' feeder disclosed by the Stuckey patent atmospheric pressure is produced intermittently and for a definite and substantial period of time.

The fact, if it be a fact, that, since the filing of the complaint in the present suit, defendants have changed their feeder so as to dispense with the relief to atmosphere, does not avoid the infringement alleged in the bill. Eibel Process Co. v. Minn. & Ontario Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523. In my opinion, the evidence fairly shows that atmospheric pressure following the subatmospheric is useful and necessary both in Peiler and in Stuckey.

Taking up for closer comparison the Peiler first patent, it is, I think, conceded that the defendants' structure employs the pump and valve means for restoring atmospheric pressure. It is further shown by the record that the defendants' device has a forehearth provided with a submerged orifice, and arranged directly above this is the air bell; and that the pump is connected with the air bell. The defendants' construction also has valves for venting the atmosphere in the pipe that connects the pump cylinder to the air bell. The air bell in the defendants' device is normally stationary, but is vertically adjustable; and the length of the stroke of the piston is also subject to regulation. The defendants' device also uses the vacuum to stop the flow of glass. All of this is in striking accord with the device disclosed by the first Peiler patent.

In my judgment, the structures are substantially the same. Their mode of operation is substantially the same; and the result obtained is substantially the same.

At the trial it was stipulated as to the operation of defendants' device (Tr. p. 81): " * * * That in the operation of such feeders at such times, pressure above and below atmospheric were created in the air tube by the reciprocation of the air pump piston, and that on each stroke of the piston a communication to atmosphere was opened between the interior of the air tube and the external atmosphere, by the movements of the valves in the pump piston; * * * that the air tube was adjusted vertically to control (C-3) the weight of the charges delivered and has been occasionally lowered to the bottom of the container when feeding was stopped though defendant states that this has not been regular practice."

With this stipulation of fact describing the defendants' device and its operation is to be compared claim 4 of the first Peiler patent: "4. In an apparatus for separating molten glass into mold charges, the combination of a glass container having a submerged outlet, an air pump, a conduit to transmit air pressure from the pump to the surface of the glass, means for actuating the pump to produce alternate compression and vacuum, valves to open the conduit to the atmosphere and means for actuating a valve in timed relation with each pressure."

It would seem to me from this comparison that there can be no escape from the charge of infringement.

As to infringement of the second Peiler patent, it seems to me that the defendants' device infringes the apparatus claims of this second Peiler patent, and that this is shown by a comparison of claim 8 of the Stuckey patent, which correctly discloses the defendants' device and its operation, with claim 14 of the Peiler second patent. Said claim 8 of the Stuckey patent reads: "8. In a device of the class described a well adapted to contain molten glass, an outlet port formed in the bottom of said well, a tubular member extending into said well in alignment with said port and communicating at its bottom

with the glass in the well, said tubular member adapted to contain a column of glass in equilibrium with the glass in said well, means for introducing a predetermined volume of air into said tubular member above the glass thereof, means for opening said tubular member to atmosphere after said volume has been introduced, means for withdrawing from said tube a volume of air equal to that previously introduced, means for opening said tubular member to atmosphere after said volume has been withdrawn, means for regulating the quickness of the movements of the air introducing and withdrawing means irrespective of the speed of operation of the device as a whole, without changing the volume of air moved at each operation, and means for regulating the volumes of air moved at each operation without changing the quickness of movements of the air-moving means."

Claim 14 of the second Peiler patent reads as follows: "14. Apparatus for segregating molten glass into freely suspended gathers of desired shape, including in combination a glass container having a discharge outlet, periodically operated means for applying different pneumatic pressures to the glass in the container for controlling the discharge of glass from the outlet, and for retracting part of the discharged glass into the outlet in regular cycles, means for adjusting said controlling means to vary the speed and the duration of the discharge and retraction, while maintaining the frequency of operation of the controlling means constant."

In my judgment, the disclosure of claim 8 of the Stuckey patent covers completely the device disclosed by claim 14 of the second Peiler patent; some additions are made in claim 8 of Stuckey. That the additions cannot prevent infringement is well established.

Comparisons of other claims might be made with like result.

Of course, it is not allowable to read into the Peiler claims which are alleged to be infringed elements of other Peiler claims, thus limiting the former for the purpose of contending that the Stuckey device does not infringe. J. L. Owens Co. v. Twin City Separator Co., 168 F. 259 (C. C. A. 8).

It seems to me that there is also infringement of the method claims of the Peiler second patent. In the application which resulted in the Stuckey patent there was presented a method claim reading as follows (Tr. p. 480): "12. The method of obtaining glass gatherings comprising providing a container having a discharge port therein, a stationary tube spaced above the discharge port, flowing molten glass into the container and tube, permitting the air in the tube to communicate with the atmosphere for a predetermined interval, for starting a flow of glass through the discharge port, compressing a predetermined amount of air in the tube for assisting the flow of glass through the discharge port whereby to uniformly shape the gathering thereat, then releasing the compressed air in the tube, shearing the gathering depending from the discharge port, then exhausting a predetermined quantity of air from the tube whereby to draw the glass into the tube and to retard flow of glass from the discharge port, and finally providing communication between the interior of the tube and the atmosphere."

This claim was rejected on reference to Peiler, and it is apparent that the process described is practically identical with the Peiler process described in the method claims. When later Stuckey filed a divisional application for a process patent, this was also rejected on Peiler. In re Stuckey (Cust. & Pat. App.) 50 F.(2d) 273.

I have not gone into a detailed discussion of the various apparatus claims of the two Peiler patents; but it seems to me that they are entitled to a broader construction than is given to them by the majority opinion; and it also seems to me that the method claims of the second Peiler patent are also entitled to a consideration which is not given them by the majority opinion.

Considering the whole range of feeders disclosed by the record, it seems clear to me that the feeders of Peiler and that of defendants are the only ones which employ the three glass-controlling pressures; are the only ones which have stationary air bells spaced above and directly over the orifice, with (a) compression to force glass out of the orifice; (b) vacuum to retard or stop the flow; and (c) a valve-controlled relief after vacuum for the gravity flow.

Giving these various claims which I have considered a reasonable construction and a correspondingly reasonable range of equivalents, I am of the opinion that the device of the defendants as disclosed by the Stuckey patent infringes the claims of the second Peiler patent; also the claims of the first Peiler patent; and claim 22 of the Ferngren patent, as above stated.

The differences in defendants' device mentioned in the majority opinion as avoiding infringement of Peiler are, in my judgment, minor in character and well within the

"fairly liberal range of equivalents" to which Peiler is entitled.

In my opinion, therefore, the decree of the trial court should be reversed.